EDWARD ORTON, JR., CERAMIC FOUNDATION, PETITIONER *v.* COMMIS-
SIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3271–67. Filed April 26, 1971.

*H. Thompson Nicholas, Jr.*, and *Roger K. Powell*, for the petitioner.
*Ross E. Springer*, for the respondent.

STERRETT, *Judge:* The Commissioner determined the following de-
ficiencies in petitioner's Federal income taxes: [1]

| Taxable year | Deficiency |
|---|---|
| 1962 | $19, 368 |
| 1963 | 7, 789 |
| 1964 | 20, 105 |

In an amended answer respondent determined the following alterna-
tive deficiencies:

| Taxable year | Deficiency |
|---|---|
| 1962 | $16, 233 |
| 1963 | 5, 209 |
| 1964 | 17, 328 |

We are to decide whether petitioner for the years in issue fails to
qualify as an organization exempt from taxation under section 501
(c)(3),[2] or is a feeder organization under section 502, or, in the
alternative, is the recipient of unrelated-business income under sec-
tions 511, 512, and 513.

FINDINGS OF FACT

Some of the facts have been stipulated and the stipulation of facts
and the exhibits attached thereto are incorporated herein by this
reference.

The Edward Orton, Jr., Ceramic Foundation (sometimes herein-
after referred to as the petitioner or the foundation) filed exempt

---

[1] Respondent has conceded that petitioner is not liable for additions to the tax under
sec. 6653, I.R.C. 1954, which were claimed in the statutory notice as well as the amended
answer.

[2] All statutory references are to the Internal Revenue Code of 1954 unless otherwise
indicated.

organization returns with the district director of internal revenue, Cincinnati, Ohio, for each of the following periods: January 1, 1962, through December 31, 1962; January 1, 1963, through June 30, 1963; July 1, 1963, through June 30, 1964; and July 1, 1964, through June 30, 1965. At the time of filing the petition herein, petitioner's principal office was located in Columbus, Ohio. For purposes of this case the parties have stipulated that the calendar year is the proper period of accounting for each of the years in issue.

Petitioner was established under the will of Edward Orton, Jr., deceased, which was admitted to probate February 28, 1932. Edward Orton, Jr. (sometimes hereinafter referred to as testator), was an outstanding authority on ceramics. His particular interest lay in scientific research and education in the field of ceramics and ceramic engineering. He received a degree as an engineer of mines from Ohio State University and later became a member of the faculty. He procured the establishment, by legislative enactment, and became the head of the Department of Ceramics at Ohio State University. He first began the manufacture of pyrometric cones in the university laboratory.

The testator later established a laboratory on a privately owned site near the university campus and conducted the business of manufacturing the cones as a private enterprise. Just prior to his death, the testator acquired a new site and erected a new laboratory known as the Orton Memorial Laboratory, in which the business of manufacturing cones is now being conducted.

Pyrometric cones are used in the manufacture of ceramics for testing the firing process and maturing of various clay products. They are described as small, slender, trihedral pyramids made of a mixture of minerals very similar to the minerals of which the ceramic bodies are composed. The cone bodies and the ceramic bodies are sufficiently alike that they react approximately the same thermochemically. The function of the pyrometric cone is to provide a convenient means of measuring the combined effect, during firing, of temperature, time, and firing atmosphere on ceramic ware. Thus the cones provide a reference standard and serve as a means of measuring and communicating the results of heat treatment of ceramic ware within the ceramic industry. In addition to being a production control, the cones are tools for basic research, and fundamental aids in ceramic education.

In his will the testator divided his estate into two parcels. The first parcel contained his pyrometric cone business and all the assets related to it. The will bequeathed the first parcel to a specified board of trustees which was to hold and operate the business in a trust known as the Edward Orton, Jr., Ceramic Foundation. Testator in his will specified the purpose of petitioner in some detail:

Sub-Item 2. *Purpose of the trust.* There are two purposes for which this trust is created. The first and principal purpose is to provide a stable and dependable organization for continuing the manufacture and sale of Standard Pyrometric Cones of the highest quality and most exact accuracy that is commercially feasible, at a reasonable price. The second and subsidiary purpose of this trust is to provide a Research Organization for the prosecution of studies and researches for overcoming technical and manufacturing difficulties, and for thus advancing the ceramic arts and industries in the United States.

Sub-Item 3. *Historical statement concerning the manufacture of the Standard Pyrometric Cones.* Prior to 1896, there was no convenient or generally accepted mode of regulating the firing process or heat treatment of Claywares in the Ceramic Industries of the United States, and virtually no mode of comparing kiln-firing practice, as between different factories, and different industries. I entered the manufacture and sale of pyrometric cones, with the purpose of performing a definite and needed service to the Ceramic Industries: (1) by enabling them to better control the firing of their products, which is the weakest point of the manufacturing process : (2) by facilitating the freer exchange of exact information concerning the firing process between ceramic manufacturers, and (3) thus inducing a better and more cooperative relationship among them, and thus making greater scientific and industrial progress probable. In this enterprise, while manufacturing profit is essential to permit its continuance, it has, from the first, been my purpose to make financial profit incidental to the principal idea of furnishing to ceramic manufacturers, a mode of controlling or regulating the firing process of their wares with the highest attainable degree of dependability at the lowest reasonable cost. Having been successful in obtaining the confidence of manufacturers of ceramic products in Standard Pyrometric Cones, it is my desire to assure myself that the manufacturing establishments which I have built up shall continue to fulfill this same useful purpose, upon the same high plane, and with the same ideals of public service, after my death.

\*　　\*　　\*　　\*　　\*　　\*　　\*

Sub-Item 6. *Mode of financing the continued operation of the trust.* It is my intention, in this Trust, to provide an organization, not for profit whose real or ultimate objects are altruistic, and wholly devoted to producing industrial, scientific and social betterments, without any personal or private gain to anyone, other than as wages paid for services rendered. To this end, it is my will that the surplus produced by the manufacturing and vending organization, known as The Standard Pyrometric Cone Company, shall be expended by the Research Organization, whose product is knowledge, given free to all who are interested. The magnitude of the surplus, necessarily, will determine the extend [sic] of the research activity. In effect, money taken from cone consumers in the form of profits on the manufacture of cones, will be returned to them in form of technical and scientific knowledge of the Ceramic Arts and Industries, which, in the nature of the case, cannot, at all times, be equally valuable and interesting to all persons from whom the money is taken. \* \* \*

\*　　\*　　\*　　\*　　\*　　\*　　\*

(d) [T]he price at which cones shall be sold shall be set to produce a gross income, of which approximately eighty percent will be required to meet the manufacturing costs, including sales, overhead, and the maintenance of proper capital reserves for extensions, depressions, or disasters, and including the cost of experimental work undertaken specifically for the needs of the cone manufacturing process itself. The remainder of the gross receipts of the cone manufacturing business being approximately twenty percent of the same, should be

expended upon Research. It is the testator's belief that the great majority of consumers of cones will willingly approve of the principle of charging a profit of twenty percent the same to be spent in research for their own ultimate benefit.

The board of trustees, according to the will, is composed of seven individuals who are: The president of Ohio State University, a representative from the National Bureau of Standards, the head of the Engineering Experiment Station of Ohio State University, the head of the Ceramic Engineering Department of Ohio State University, the secretary of the American Ceramic Society, one other representative from the American Ceramic Society, and an attorney at law. The trustees receive from the petitioner $1 per year plus expenses incurred in relation to trust business. The attorney on the board, however, receives compensation for legal services he renders to the trust.

The trustees have full power over the general policy of, and the relationship between, the trust, the cone-manufacturing operation, and the research effort. They select the general manager for manufacturing and a research director, which positions can be occupied by the same person. The board has power to alter the manufacturing operation and to enter into related lines of endeavor if the cone becomes obsolete or unable to compete with other measuring devices. Further, the trustees:

have authority * * * to cease manufacture and close up the cone manufacturing business, if, for any reason, the same has become unable to longer function successfully, or if scientific progress makes it no longer necessary or advisable to continue * * *

If the trust is dissolved, all of its assets are required to be turned over to Ohio State University.

The will gives the trustees power to organize the research effort as an in-house operation, or as a program to supplement and assist ceramic research being carried on by other organizations. The will further provides that:

In whatever manner the Trustees may organize and operate the Research Department, they shall publish the results of its researches and activities through trade journals, the Transactions of scientific and industrial societies, reports of Universities or Experiment Stations or in other appropriate manner, to the end that said results shall be given freely to the public and made available for the use of the Ceramic Industries, and said Trustees shall not sell or permit its agents and employees to sell, or to make any charge, direct or indirect, for any information furnished through or by said Research Department, to [the] end that all surplus over and above the cost of production made upon the sale of Standard Pyrometric Cones shall be returned to the Ceramic Industries in the form of technical knowledge.

The executors of testator's estate transferred all of the assets of his cone business to the trustees of petitioner in December of 1933. Peti-

tioner has continuously been under the jurisdiction of the Probate Court of Franklin County, Ohio. The Probate Court closely supervises the trustees' administration of petitioner to be sure the purposes of the will are being carried out.

Although the board of trustees has formed an executive committee consisting of three of its members, the daily operations of petitioner are left to the general manager and research director. The board has followed the practice of filling the posts of general manager and research director with the same individual. Regular meetings of the board are held in which it considers matters concerning the allocation of funds and receives reports from the general manager/research director.

The manufacturing of cones has been carried on by the trustees under the terms of the will since 1933 and during the years in issue. Most of petitioner's sales are to manufacturers of ceramic products. Some sales are made to scientific and research laboratories and to ceramic art studios throughout the United States. Substantial sales are also made outside the United States.

The American Standard Materials Society specifies Orton Standard Pyrometric Cones be used in the Pyrometric Cone Equivalent Test. This is a test which evaluates the refractoriness of refractory materials. The PCE value resulting from the test is an important specification of refractory material, and is utilized in describing and purchasing such material. The American Ceramics Society cooperates with ASTM in establishing this standard. The Orton Pyrometric Cones have been accurately established as a reference standard by the National Bureau of Standards.

During the years before the Court another manufacturer, Bell Research, Inc., Chester, W. Va., competed with petitioner in the production of standard pyrometric cones in the United States. The Bell series of cones is not as long as petitioner's and does not deal with as wide a temperature range. Pyrometric cones produced by Bell do not perform identically to petitioner's; they appear to have a greater variability within a lot. The prices on petitioner's cones were higher than those on the Bell-produced cones. German-manufactured cones have been tested by petitioner and found to have an even greater variability within a lot than the Bell cones.

There are two other known devices designed to measure the combined effect of temperature and time in the firing of ceramics. They are the "Fire-Chek Keys" manufactured by Bell Research, Inc., and the "Veritas Ring" manufactured by Fortune Ceramics, Trenton, N.J. In addition the ceramic industry also relies upon the use of separate devices measuring time or measuring temperature, such as

clocks and pyrometers, which are used for both measurement and control of one or all the other factors in connection with the regulation of the heat treatment of ceramic products. Some of these devices are the "Tempilstiks" manufactured by the Burrell Corp., Pittsburgh, Pa., and "Thermochrom Crayons" and "Detecto-Temp Paints" manufactured by H. V. Hardman Co., Inc., Belleville, N.J., and Curtiss-Wright Corp., East Paterson, N.J. Although these products are available, the pyrometric cone is a control over the firing aspect of production for which industry has no substitute.

For the years involved herein, petitioner employed the advertising agency Wheeler, Kight and Gainey, Inc., of Columbus, Ohio, to handle all of its advertising. For each of the calendar years involved petitioner incurred the following advertising expenses:

| | |
|---|---|
| 1962 | $13,925.17 |
| 1963 | 14,808.86 |
| 1964 | 15,375.02 |

Advertisements pertaining to the sale of the Orton Pyrometric Cones appeared in the various ceramic publications as full-page, half-page, or one-third-page ads on a regular or periodic basis.

In early 1964, petitioner introduced a new product known as the "Orton Automatic Recording Dilatometer." Petitioner's advertising agency prepared a one-page brochure for use in the press release of this new product. The Dilatometer measures the thermal behavior of materials in relationship to their dimensional change. The first Dilatometer unit was completed and delivered in January 1964 to the Mosaic Tile Co. Five additional units were completed by December 1964. Petitioner realized a profit of $343 on the sale of the first Dilatometer in 1964 but sales in subsequent years have failed to produce a profit. A testing service was available through petitioner which made use of the new Dilatometer. The charge for this service was $10 per specimen with a quantity discount of 10 percent if 10 or more samples were forwarded to the petitioner for testing.

Petitioner's returns reveal it computed its income in the following manner for the periods indicated:[3]

---

[3] The parties have stipulated that respondent's computations of income and deficiency can be accepted by the Court in the event this Court determines any of the questions raised in favor of the respondent. However, the parties did not otherwise agree as to what was a proper income computation for the petitioner during the years in issue, nor did the parties present evidence on the matter. Although most of petitioner's computations are on a fiscal year basis, and the parties have agreed that the calendar year is the proper accounting period for petitioner, we have set out petitioner's computations so that certain comparisons germane to our determination herein can be made. Respondent's figures have been set out for the sake of completeness.

| | Jan. 1, 1962—Dec. 31, 1962 | Jan. 1, 1963—June 30, 1963 | July 1, 1963—June 30, 1964 | July 1, 1964—June 30, 1965 |
|---|---|---|---|---|
| **Sales:** | | | | |
| At list price | $422,749 | $203,421 | $414,919 | $397,289.06 |
| Less trade discounts | 83,176 | 39,344 | 81,074 | |
| Less returns and allowances | 1,392 | 610 | 854 | 1,024.46 |
| Net sales | 338,181 | 163,467 | 332,991 | 396,264.60 |
| Cost of merchandise sold | 176,004 | 89,690 | 172,851 | 208,952.95 |
| Gross profit | 162,177 | 73,777 | 160,140 | 187,311.65 |
| Service income | | 100 | 94 | |
| **Operating expenses:** | | | | |
| Sales expense | 24,843 | 13,046 | 26,760 | 23,964.04 |
| General and administrative expense | 96,333 | 51,300 | 108,550 | 105,560.65 |
| Total operating expenses | 121,176 | 64,346 | 135,310 | 129,524.69 |
| Net operating income | 41,001 | 9,531 | 24,924 | 57,786.96 |
| **Nonoperating income:** | | | | |
| Interest | 4,043 | 2,091 | 3,978 | 4,026.19 |
| Dividends | 2,022 | 749 | 2,575 | 2,494.71 |
| Rent | 900 | 450 | 900 | 750.00 |
| Purchase discounts | 600 | 283 | 601 | 712.38 |
| Other | 193 | 46 | 189 | |
| Total nonoperating income | 7,758 | 3,619 | 8,243 | 7,983.28 |
| Nonoperating expense | 720 | 568 | 703 | 720.60 |
| Net income before pension plan adjustment | 48,039 | 12,582 | 32,464 | 65,049.64 |
| Pension costs | 4,200 | 2,100 | 4,200 | 4,200.00 |
| Net income for period | 43,839 | 10,482 | 28,264 | 60,849.64 |

Respondent, in the statutory notice, made the following recomputation of petitioner's income on the calendar year basis in line with respondent's contention that petitioner does not qualify as an exempt organization during the periods indicated:

| | 1962 | 1963 | 1964 |
|---|---|---|---|
| Net sales | $338,181 | $326,844 | $365,042 |
| Less: Cost of goods sold | 176,004 | 172,564 | 188,822 |
| Gross profit on sales | 162,177 | 154,280 | 176,220 |
| Less: Operating expenses | 121,176 | 140,055 | 127,990 |
| Net operating income | 41,001 | 14,225 | 48,230 |
| **Add:** | | | |
| Nonoperating income | 973 | 1,034 | 1,962 |
| Dividend income | 1,075 | 1,168 | 1,310 |
| Capital gain | 473 | 652 | 627 |
| Interest income | 4,043 | ·4,142 | 3,400 |
| Total income | 47,565 | 21,221 | 55,529 |
| Add: Pension contribution not deductible | 9,000 | 9,000 | 8,700 |
| Charitable contribution deducted | 923 | 1,150 | 732 |
| Total | 57,488 | 31,371 | 64,961 |
| **Less:** | | | |
| Payments to retired employees | (240) | (400) | (620) |
| Dividend deduction | (50) | (50) | (100) |
| Total trust income before charitable contributions | 57,198 | 30,921 | 64,241 |
| Less: Allowable charitable contribution deduction | (17,160) | (9,276) | (19,272) |
| Trust income after contributions | 40,038 | 21,645 | 44,969 |
| Less: Trust exemption | (100) | (100) | (100) |
| Trust taxable income | 39,938 | 21,545 | 44,869 |

Respondent in his amended answer asserted in the alternative that petitioner was liable for unrelated-business income tax, and, consistently therewith, made the following computation of petitioner's income:

|  | 1962 | 1963 | 1964 |
|---|---|---|---|
| Net sales | $338,181 | $326,844 | $365,042 |
| Less: Cost of goods sold | 176,004 | 172,564 | 188,822 |
| Gross profit on sales | 162,177 | 154,280 | 176,220 |
| Less: Operating expenses | 121,176 | 140,055 | 127,990 |
| Net operating income | 41,001 | 14,225 | 48,230 |
| Other income included in unrelated-business income | 793 | 880 | 1,781 |
| Total income for unrelated-business income computation | 41,794 | 15,105 | 50,011 |
| Add: | | | |
| Pension contribution not deductible | 9,000 | 9,000 | 8,700 |
| Charitable contribution deducted | 923 | 1,150 | 732 |
| Total | 51,717 | 25,255 | 59,443 |
| Less: Payments to retired employees | (240) | (400) | (620) |
| Trust income before charitable contributions | 51,477 | 24,855 | 58,823 |
| Add: Loss on sale of asset | | 176 | |
| | 51,477 | 25,031 | 58,823 |
| Less allowable charitable contributions | 15,443 | 7,509 | 17,647 |
| Trust income after contributions | 36,034 | 17,522 | 41,176 |
| Less: Exclusion to unrelated-business income | 1,000 | 1,000 | 1,000 |
| Unrelated-business income | 35,034 | 16,522 | 40,176 |

The return from cone manufacturing was not petitioner's only source of income. Rather, during the years in issue petitioner realized a goodly portion of its net income from interest on savings accounts, and Government and corporate bonds, from dividends on mutual funds, and from rent on real estate.

Petitioner's accumulated income at the end of the indicated periods was as follows:

| | |
|---|---|
| 1961 | $368,475.00 |
| 1962 | 372,246.00 |
| Jan. 1, 1963—June 30, 1963 | 361,928.00 |
| July 1, 1963—June 30, 1964 | 363,392.00 |
| July 1, 1964—June 30, 1965 | 379,603.61 |

During the years in issue petitioner conducted research in its facility, and also sponsored research in universities. Thirty percent of petitioner's facility was devoted to research during 1962, 1963, and 1964. The approximate salary and overhead costs of petitioner's in-house research during the period relevant to this case were as follows:

| | |
|---|---|
| 1962 | $54,000 |
| Jan. 1, 1963—June 30, 1963 | 32,800 |
| July 1, 1963—June 30, 1964 | 66,600 |
| July 1, 1964—June 30, 1965 | 57,000 |

Research activities conducted in the petitioner's physical plant have been confined primarily to problems directly connected with the manufacture and use of the pyrometric cone.

The research which the petitioner sponsored in certain universities was funded by the net income realized from the cone-manufacturing operation and the few investments the petitioner had. This research was concerned with the firing process in the field of ceramic engineering. The bulk of the grants made by petitioner was in the form of fellowships to selected graduate students in the major ceramic engineering departments of colleges or universities in the United States. Although the funds were channeled through a given college, the funding took the form of a specific grant to a selected candidate who was to work on a given project. Normally application for a grant would be made by, e.g., the head of a university ceramic engineering department. The department head would request funds for a specific student stating his qualifications, and outlining his proposed project. Petitioner's general manager/research director would handle the administrative details of the applications and make an initial recommendation to the board of trustees which made the final determination. Although a member of a university faculty might recommend a student for a grant, the final selection rested with the board. The end products of the research conducted by a grant recipient were theses, a number of which were published in ceramic trade and professional journals.

Petitioner also had a program of honorariums designed to encourage higher quality and publication of the research funded by the grants. The honorarium was usually $200 granted to the individual who supervised the researching student if the results of the research were published.

Some grants were made to two or three endowments already established at Ohio State University. In the case of one of these endowments the selection process for a grant recipient was the same as applied to other individual research grants made by petitioner. Determination of distributions from the other endowments was made by the university. Petitioner has also made grants for equipment and special projects to universities and other institutions conducting research in the field of ceramics.

Petitioner did not necessarily make grants to or through the same institutions every year. The following aggregate distributions were made by petitioner for research in other institutions, honorariums, and equipment during the indicated periods:

| Periods | Distributions |
|---|---|
| 1962 | $34, 908 |
| Jan. 1, 1963—June 30, 1963 | 17, 033 |
| July 1, 1963—June 30, 1964 | 32, 700 |
| July 1, 1964—June 30, 1965 | 45, 000 |

The greatest portion of the foundation's distributions was for fellowship grants and honorariums.

The foundation was also the petitioner in the case of *Edward Orton, Jr. Ceramic Foundation*, 9 T.C. 553 (1947), affd. 173 F. 2d 483 (C.A. 6, 1949). There it was determined petitioner was exempt under section 101(6), I.R.C. 1939, during the taxable year 1940. Petitioner has continued to rely on that decision as determining it has exempt status. Petitioner's mode of operation has not changed significantly nor have the terms of the trust been amended since 1940.

During the years 1962, 1963, and 1964, petitioner considered itself exempt under section 501(c)(3). Respondent, in a statutory notice of deficiency dated April 6, 1967, said:

It is held that the Edward Orton, Jr., Ceramic Foundation is not an organization described in Section 501(c)(3) of the Internal Revenue Code and, therefore, is not exempt from tax under Section 501(a) of the Internal Revenue Code. It is further held that the Edward Orton, Jr., Ceramic Foundation is a feeder organization under Section 502 of the Internal Revenue Code and taxable as a Trust under Section 641 of the Internal Revenue Code. * * *

In his amended answer, respondent took an alternative position that petitioner during the years in issue realized unrelated-business income which is taxable under section 511, I.R.C. 1954.

The parties have stipulated that, if the Court finds for respondent on any one of the issues raised in the statutory notice or amended answer, then the Court may accept that computation of income and deficiencies contained in the statutory notice or amended answer relevant to the determination made by the Court.

### OPINION

Respondent, in a statutory notice, asserted petitioner was not exempt during 1962, 1963, and 1964 under section 501(a) because it was not during that period an organization described in section 501(c)(3), or because it was a feeder organization within the meaning of section 502.[4] By amended answer, respondent, in the alternative, claimed that,

---

[4] SEC. 501. EXEMPTION FROM TAX ON CORPORATIONS, CERTAIN TRUSTS, ETC.

(a) EXEMPTION FROM TAXATION.—An organization described in subsection (c) * * * shall be exempt from taxation under this subtitle unless such exemption is denied under section 502 * * *.

* * * * * * *

(c) LIST OF EXEMPT ORGANIZATIONS.—The following organizations are referred to in subsection (a):

* * * * * * *

(3) Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation, and which does not participate in, or

if petitioner was exempt, it was nevertheless the recipient of unrelated-business taxable income.[5]

This is the second occasion on which petitioner has been called upon to defend its exempt status in this Court. We upheld that status in *Edward Orton, Jr. Ceramic Foundation*, 9 T.C. 533 (1947), affd. 173 F. 2d 483 (C.A. 6, 1949).

When we analyze respondent's present contention that petitioner is not an exempt organization under section 501(c)(3), we find part of the answer in our earlier decision and its affirmation by the Sixth Circuit. It was there determined that petitioner was indeed organized for the requisite exempt purpose. Since there has been no change in the law on that score, we fail to see how our decision could change.

For the sake of completeness of this decision we note briefly that the following provisions in the founding testamentary trust justify our reaffirmation:

1. The trust was founded for the "first and principal purpose" of continuing the manufacture of Standard Pyrometric Cones "of the highest quality and most exact accuracy" and for the "second and subsidiary purpose" of providing "a Research Organization for the prosecution of studies and researches * * *, and for thus advancing the ceramic arts and industries in the United States."

---

intervene in (including the publishing or distributing of statements), any political campaign on behalf of any candidate for public office.
SEC. 502. FEEDER ORGANIZATIONS.
An organization operated for the primary purpose of carrying on a trade or business for profit shall not be exempt under section 501 on the ground that all of its profits are payable to one or more organizations exempt under section 501 from taxation. * * *
[5] SEC. 511. IMPOSITION OF TAX ON UNRELATED BUSINESS INCOME OF CHARITABLE, ETC., ORGANIZATIONS.
(b) TAX ON CHARITABLE, ETC., TRUSTS.—
(1) IMPOSITION OF TAX.—There is hereby imposed for each taxable year on the unrelated business taxable income of every trust described in paragraph (2) a tax computed as provided in section 1. In making such computation for purposes of this section, the term "taxable income" as used in section 1 shall be read as "unrelated business taxable income" as defined in section 512.
(2) CHARITABLE, ETC., TRUSTS SUBJECT TO TAX.—The tax imposed by paragraph (1) shall apply in the case of any trust which is exempt, except as provided in this part, from taxation under this subtitle by reason of section 501(c)(3) or (17) or section 401(a) and which, if it were not for such exemption, would be subject to subchapter J (sec. 641 and following, relating to estates, trusts, beneficiaries, and decedents).
SEC. 512. UNRELATED BUSINESS TAXABLE INCOME.
(a) DEFINITION.—The term "unrelated business taxable income" means the gross income derived by any organization from any unrelated trade or business (as defined in section 513) regularly carried on by it, * * *
SEC. 513. UNRELATED TRADE OR BUSINESS.
(a) GENERAL RULE.—The term "unrelated trade or business" means, in the case of any organization subject to the tax imposed by section 511, any trade or business the conduct of which is not substantially related (aside from the need of such organization for income or funds or the use it makes of the profits derived) to the exercise or performance by such organization of its charitable, educational, or other purpose or function constituting the basis for its exemption under section 501 * * *

2. While profit was essential to the continuance of the enterprise, testator's purpose from the first was:

to make financial profit incidental to the principal idea of furnishing to ceramic manufacturers, a mode of controlling or regulating the firing process of their wares with the highest attainable degree of dependability at the lowest reasonable cost.

3. The price at which the cones could be sold is limited to produce a 20-percent profit which must be "expended upon Research."

4. Testator said it was his intention:

To provide an organization, not for profit, whose real or ultimate objects are altruistic, and wholly devoted to producing industrial, scientific and social betterments, without any personal or private gain to anyone, * * *. To this end, * * * the surplus produced by the manufacturing and vending organization, * * * shall be expended by the Research Organization, whose product is knowledge, given free to all who are interested.

5. The results of the research are to be published and thus be freely available to the public and the ceramic industry "to the end that all surplus * * * made upon the sale of Standard Pyrometric Cones shall be returned to the Ceramic Industries in the form of technical knowledge."

6. The trustees are authorized to cease manufacture and close up the cone-manufacturing business "if scientific progress makes it no longer necessary or advisable to continue" and the assets are to be distributed upon dissolution to the Ohio State University.

Further, we find that petitioner has met the operating requirements for exemption of section 501(c)(3). As our findings of fact state, petitioner's mode of operation has not changed significantly since our prior decision. We there stated, 9 T.C. at 539, that "The predominate purpose for which the petitioner was organized * * * was to promote the science or art of ceramics" and that purpose was an exempt one. Section 1.501(c)(3)–1(c), Income Tax Regs., provides with respect to the "operational test" that "An organization will be regarded as 'operated exclusively' for one or more exempt purposes only if it engages primarily in activities which accomplish one or more of such exempt purposes."

Pursuant to the terms of the will petitioner has continued the manufacture of Orton Standard Pyrometric Cones since the foundation was established. The cones must be sold for no more than a 20-percent profit. Thus, unlike the normal commercial operation the sale of cones can produce only a limited profit. In addition to a return from the manufacture of cones, petitioner also realized income from interest on savings accounts, Government and corporate bonds, dividends on mutual funds, and rent on real property.

Utilizing its net income from manufacturing and nonoperating sources, petitioner sponsored research in other institutions concerning the ceramic firing process. Most of the research expenditures were in the form of fellowships awarded to selected graduate students in ceramic engineering departments of colleges and universities. Although the funds were channeled through a given school, the funding took the form of a specific grant to a selected candidate who was to work on a given project.[6] The candidate and project were selected by petitioner's board of trustees.

Normally the fellowship grantee would write a thesis setting out the results of his research. Many of the theses resulting from the research sponsored by petitioner were published in journals concerning ceramic arts. To induce higher quality research and its publication, petitioner paid honorariums, normally of $200, to the individual who supervised the researching student if the research was published.

Petitioner also made grants for equipment and special projects to universities and other institutions conducting research in the field of ceramics. In one or two instances petitioner made grants to established endowments run by Ohio State University which reserved to itself the selection of student distributees.

A comparison of petitioner's annual net income with its distributions in pursuit of its fellowship and grant program reveals that it always expended a major portion of, and sometimes an amount exceeding, its net income on that program:

| Period | Net income | Distributions |
|---|---|---|
| 1962 | $43,839.00 | $34,908 |
| Jan. 1, 1963—June 30, 1963 | 10,482.00 | 17,033 |
| July 1, 1963—June 30, 1964 | 28,264.00 | 32,700 |
| July 1, 1964—June 30, 1965 | 60,849.64 | 45,000 |

The present matter contrasts sharply with *Scripture Press Foundation* v. *United States*, 285 F. 2d 800 (Ct. Cl. 1961) ; *Parker* v. *Commissioner*, 365 F. 2d 792 (C.A. 8, 1966), affirming in part a Memorandum Opinion of this Court; and *Fides Publishers Ass'n.* v. *United States*, 263 F. Supp. 924 (N.D. Ind. 1967). Fundamental to determinations in those cases that the organizations in question were not exempt were findings of large profits, substantial accumulations of income, and relatively small amounts of actual exempt activity. Petitioner on the other hand was not a business of burgeoning profits, and greatly increasing accumulations of income in relation to distributions.

Ninety percent of petitioner's net income for the period in issue was expended on its fellowship and grant program. During the period

[6] Cf. sec. 4945 (d) (3), added by sec. 101(1), Tax Reform Act of 1969. Respondent has recognized that an exempt organization can make distributions to individuals in furtherance of the organization's exempt purpose. Rev. Rul. 56–304, 1956–2 C.B. 306.

January 1, 1962, through June 30, 1965, petitioner realized net income in the total amount of $143,434.64. Of that amount, $129,641 was expended on the program. Petitioner had no program for accumulating income for expansion. Compensation for employees was moderate. Members of petitioner's board of directors were given a dollar a year plus the expenses of attending meetings.

The aforenoted 20-percent limitation on profit prescribed by the testator is analogous to our finding of fact in *Forest Press, Inc.*, 22 T.C. 265, 267 (1954), wherein we noted that:

> The price for an edition of the system is determined by the manufacturing expense, plus the estimated cost of carrying the small staff until the date of a subsequent edition. *The price is not fixed with any intent to make a profit over and above the expenses involved in running the corporation and publishing the system.* * * * [Emphasis added.]

This Court went on to conclude that the organization there at issue was entitled to its tax exemption. We might note, too, that the item produced and sold by Forest Press, a Dewey Decimal Classification System and Related Index, is more analogous to the pyrometric cone, in terms of the relationship between the function of the item sold and the exempt purposes of the organization, than to the items involved in the other cases cited.

The facts in this case are quite close to those of Rev. Rul. 64–182, 1964–1 C.B. (Part 1) 186. There a charitable organization derived its income principally from the rental of space in a commercial office building, and pursued its exempt program by aiding other charitable organizations, selected at the discretion of its governing body, through contributions and grants. Such organization is deemed by the ruling to meet the primary purpose test of section 1.501(c)(3)–1(e)(1), Income Tax Regs.,[7] and to be exempt where its program is shown to be commensurate with its financial resources. See also Rev. Rul. 55–406, 1955–1 C.B. 73.

Respondent contends that certain provisions of the Revenue Act of 1950, 64 Stat. 210, have in effect vitiated the force of our decision and its affirmance in *Edward Orton, Jr. Ceramic Foundation, supra.* Section 301 of the Revenue Act of 1950 introduced into the law the feeder organization and the unrelated business income provisions. Feeders were unconditionally declared nonexempt, and unrelated business income was made subject to tax. Congress opted for this solution to rectify the problem of unfair business competition made possible because of exempt income, and exacerbated in no small measure by a

---

[7] Sec. 1.501(c)(3)–1(e)(1). An organization may meet the requirements of section 501(c)(3) although it operates a trade or business as a substantial part of its activities, if the operation of such trade or business is in furtherance of the organization's exempt purpose or purposes and if the organization is not organized or operated for the primary purpose of carrying on an unrelated trade or business, as defined in section 513. * * *

liberal application of the destination-of-income test. H. Rept. No. 2319, 81st Cong., 2d Sess. (1950), 1950–2 C.B. 380, 409, 412; S. Rept. No. 2375, 81st Cong., 2d Sess. (1950), 1950–2 C.B. 483, 504, 509.

A close reading of the legislative history of the Revenue Act of 1950 indicates that Congress was quite specific in choosing a remedy for the problem it saw, and that it did not intend to alter the meaning of what is now section 501(c)(3). The only type of organization whose eligibility for exempt status Congress professed to deal with was the feeder organization. By enacting what is now section 502, Congress said no organization operated primarily to carry on a trade or business for profit will be exempt merely because all its profits are payable to an organization exempt under section 501. When enacting this provision Congress expressed the judgment that "such an organization is not itself carrying out an exempt purpose." H. Rept. No. 2319, 1950–2 C.B. 412. As to other organizations involved in exempt activities, Congress chose to impose a tax on income realized from an unrelated business regularly carried on rather than deny them an exemption. Speaking of the unrelated-business income provisions, Congress said:

In fact it is not intended that the tax imposed on unrelated business income will have any effect on the tax-exempt status of any organization. An *organization which is exempt prior to the enactment of this bill*, if continuing the same activities, *would still be exempt* after this bill becomes law. [Emphasis supplied. S. Rept. 2375, 1950–2 C.B. 504–505.]

Thus it appears that in the Revenue Act of 1950 Congress effected a very deliberate and specific change in the qualifications an organization must have to be exempt under section 501. This change was not so sweeping as to cause courts to define anew, on a more narrow basis, what is charitable, educational, scientific, etc. To hold otherwise is to engage in judicial legislation. *University Hill Foundation*, 51 T.C. 548, 561, 564, 566 (1969), on appeal (C.A. 9, July 14, 1969). Cf. *Lichter Foundation* v. *Welch*, 247 F. 2d 431, 436 (C.A. 6, 1957), reversing an unreported case (S.D. Ohio 1956, 51 A.F.T.R. 1551, 56–2 U.S.T.C. par. 9835).

Now we turn to the question of whether petitioner was a feeder organization within the meaning of section 502. Under the statute an organization operated primarily for carrying on a trade or business will not be exempt merely because its profits are payable to another exempt organization. Whether petitioner was operated primarily to carry on a trade or business is a question of fact. *Veterans Foundation* v. *United States*, 281 F. 2d 912, 914 (C.A. 10, 1960), affirming 178 F. Supp. 234 (D. Utah 1959). A court should view all phases of an organization's operations in making this determination. *Hospital Bureau of Standards & Sup.* v. *United States*, 158 F. Supp. 560,

564 (Ct. Cl. 1958). Petitioner was, as found above, actually carrying on a program of exempt activities of a scientific and educational nature. Cf. *Sico Foundation* v. *United States*, 295 F. 2d 924, 925, 926 (Ct. Cl. 1961).

The primary purpose of the foundation was to carry on its exempt program, which it did in its operations and with its net income from operating and nonoperating sources in accordance with the testator's will. The evidence clearly indicates that distributions for fellowships were based on a determination by petitioner's board of trustees that a fellowship candidate was capable of doing significant research and that his proposed topic was of value in the field of ceramic engineering. These determinations were not made by any of the institutions through which the funds were channeled. This clearly indicates that the petitioner, in its fellowship program, was involved in the selection of individuals and not institutions. Additionally, petitioner had no obligation to distribute funds or equipment to or through specific institutions, nor did it in fact always make distributions to or through the same institutions each year. Petitioner was not owned or controlled by any of the institutions to or through which it made grants. Upon a consideration of the evidence as to the nature of petitioner's operations, we conclude that the foundation was not a feeder organization during the years in issue.

Finally we direct ourselves to the question of whether petitioner during 1962, 1963, and 1964 received unrelated-business taxable income. This turns on whether petitioner's cone-manufacturing operation was a trade or business, regularly carried on, and substantially related to its exempt function. Sections 512 and 513. This question was first raised by respondent in an amended answer, and accordingly the burden of proof rests on him. Rule 32, Tax Court Rules of Practice.

The term "trade or business" as used in sections 512 and 513 has the same meaning as it has elsewhere in the Code. *Cooper Tire & Rubber Co. Employees' Retirement Fund*, 36 T.C. 96, 100 (1961), affirmed per curiam 306 F. 2d 20 (C.A. 6, 1962). It is clear that petitioner manufactured and sold pyrometric cones in the open market at a limited profit. This was a continuation of the testator's business. The record also shows that the manufacturing effort was pursued on a regular basis rather than a sporadic basis. Consequently we find that the cone manufacturing was a trade or business regularly carried on by petitioner.

The remaining question under this issue is whether petitioner's trade or business was related to its exempt function. When Congress was contemplating the passage of the unrelated-business provisions the Secretary of the Treasury testified concerning the problem to which the proposal was directed:

To meet this problem, it is recommended that the income derived by these institutions from the operation of business which are *clearly unrelated to their primary functions* be taxed at regular corporation income tax rates. [Emphasis added. Hearings before the House Committee on Ways and Means on Revenue Revision of 1950, vol. 1, p. 19.]

Concerning the statutory scheme ultimately adopted, Congress made the following comment:

If a trade or business is regularly carried on, it is still not subject to the supplement U tax [i.e., the unrelated-business income tax] unless such *business is unrelated* within the the meaning of section 422(b) [now section 513(a)] * * * [Emphasis supplied. S. Rept. No. 2375, 81st Cong., 2d Sess. (1950), 1950-2 C.B. 559.]

In accord with these views is section 1.513-2 (a) (4), Income Tax Regs., which applies to the years before us.[8] That regulation provides:

Ordinarily, a trade or business is substantially related to the activities for which an organization is granted exemption if the *principal purpose* of such trade or business is to further (other than through the production of income) the purpose for which the organization is granted exemption. In the usual case the nature and size of the trade or business must be compared with the nature and extent of the activities for which the organization is granted exemption in order to determine whether the principal purpose of such trade or business is to further (other than through the production of income) the purpose for which the organization is granted exemption. [Emphasis supplied.]

Petitioner's exempt purpose in general is to promote the science or art of ceramics. The testator in his will stated he entered the manufacture and sale of cones with the purpose of better controlling the firing of ceramic products and facilitating the freer exchange of exact information concerning that process. It was the testator's desire:

That the manufacturing establishments which I have built up shall continue to fulfill this same useful purpose, upon the same high plane, and with the same ideals of public service, after my death. * * *

and

To make financial profit incidental to the principal idea of furnishing to ceramic manufacturers, a mode of controlling or regulating the firing process of their wares with the highest attainable degree of dependability * * *

The intention was not that the manufacturer of pyrometric cones would be merely a source of income but rather that it would serve as the necessary predicate to furthering the foundation's scientific and

---

[8] Formerly designated as sec. 1.513-1(a) (4) ; redesignated and made applicable only to years beginning before Dec. 13, 1967, by T.D. 6939, 1968-1 C.B. 274. The regulations effective for subsequent years caused much controversy upon their adoption and were deemed by some to be an expansion of the categories of "unrelated income." See Middleditch and Webster "The New Unrelated Business Income Regs.; What They Mean: How to Cope with Them," 28 J. Taxation 174 (1968) ; and Welthorn and Liles "Unrelated Business Income Tax: Changes Affecting Journal Advertising Revenues," 45 Taxes 791 (1967).

educational purposes. See *Mobile Arts and Sports Association* v. *United States*, 148 F. Supp. 311, 316 (S.D. Ala. 1957). Since the testator's will was executed in October of 1928, its directory terminology cannot be equated with code words for tax avoidance.

Orton Standard Pyrometric Cones are the most reliable cones available. They have been calibrated by the National Bureau of Standards and are the only cones which can be used in the American Standard Materials Society Pyrometric Cone Equivalent Test of refractoriness. While other devices perform similar functions, pyrometric cones are essential to the ceramic industry. Thus an invaluable and irreplaceable standard of measurement, tool for research, and means of communication concerning the firing of ceramic ware has been continuously available to the ceramic industry and to the ceramic engineering profession. Cf. *Forest Press, Inc., supra.*

There is no evidence showing extensive accumulations of income by petitioner for use in expanding the manufacturing operation. Further there is no evidence that petitioner used its exempt status to gain an unfair competitive advantage; indeed petitioner's cones were higher priced than those of the only other manufacturer of cones made known to this Court.

Having the burden of proof the respondent is bound to see that there is before us evidence sufficient to show that the cone business did not have as a principal purpose the furtherance (other than through the production of income) of the foundation's exempt purpose, or to suffer us finding against him on this issue. Upon a consideration of the whole record we are not satisfied that there is sufficient evidence to decide that the manufacture of pyrometric cones as conducted by petitioner did not have as its primary purpose the furtherance of the foundations' exempt purpose.

For the reasons given, we hold that during the years in issue petition's manufacturing of pyrometric cones was not an unrelated trade or business within the meaning of section 513(a), and consequently, that petitioner did not receive unrelated-business taxable income subject to taxation under the provisions of sections 511(b) and 512.

Due to concessions and in accordance with the foregoing,

*Decision will be entered under Rule 50.*

Reviewed by the Court.

———

RAUM, *J.*, dissenting: The majority holds an organization primarily and directly engaged in the manufacture and sale of a commercial product at a profit to be exempt from taxation. It also holds that the income received by the organization from its commercial activities is not unrelated-business taxable income and must therefore altogether

escape taxation. I dissent from both conclusions. They are completely at odds with the purposes of the applicable congressional legislation.

Prior to his death, Edward Orton, Jr., conducted the business of manufacturing "pyrometric cones" as a private profit-making enterprise. His will bequeathed the business to a board of trustees which was to operate it in a trust. The will specified that the trust had two purposes: (1) The "first and *principal purpose*" was "to provide a stable and dependable organization for *continuing the manufacture and sale of*" the cones of the highest quality "*commercially feasible, at a reasonable price.*" (Emphasis supplied.) (2) The "second and subsidiary purpose" was to provide a "Research Organization" for overcoming technical and manufacturing difficulties and for thus advancing the ceramic arts and industries. With regard to pricing, the will provided as follows:

(d) [T]he *price* at which cones shall be sold shall be set to produce a gross income, of which approximately eighty percent will be required to meet the manufacturing costs, *including* sales, overhead, and the *maintenance of proper capital reserves for extensions,* depressions, or disasters, and *including the cost of experimental work* undertaken specifically *for the needs of the cone manufacturing process* itself. The remainder of the gross receipts of the cone manufacturing business being approximately twenty percent of the same, should be expended upon Research. It is the testator's belief that the great majority of consumers of cones will willingly approve of the principle of charging a profit of twenty percent the same to be spent in research for their own ultimate benefit. [Emphasis supplied.]

During the years in issue, and in accordance with the terms of Orton's will, the taxpayer continued the commercial enterprise which had been conducted by Orton prior to his death, in the same location, with the same product, in competition at least to some extent with other firms, and earning a profit. Each year, its annual net sales were in excess of $325,000. Moreover, in accordance with the terms of the will, the research activities conducted within the taxpayer's physical plant were confined primarily to the development of the commercial product which the taxpayer manufactured and sold to the public: the pyrometric cone. The table below reflects the amounts spent by the taxpayer on such in-house research as well as the amounts distributed for research at other institutions:

|  | In-house research | Distributions |
|---|---|---|
| 1962 | $54,000 | $34,908 |
| Jan. 1, 1963—June 30, 1963 | 32,800 | 17,033 |
| July 1, 1963—June 30, 1964 | 66,600 | 32,700 |
| July 1, 1964—June 30, 1965 | 57,000 | 45,000 |

The conclusion is virtually inescapable that the taxpayer's manufacturing operations, not its charitable distributions, dominated the

organization's activities, and that the scale of the taxpayer's manufacturing operations far exceeded that which might be appropriate and helpful to furthering the organization's scientific and educational purposes.

The social or economic utility of the taxpayer's product does not render its manufacture and sale to the public at a profit any less commercial, or more charitable than the manufacture and sale of other products. In any event, the manufacture and sale of the pyrometric cone is certainly no less commercial than the publication and sale of religious literature, *Fides Publishers Ass'n* v. *United States*, 263 F. Supp. 924, 935 (N.D. Ind.) ;[1] *Scripture Press Foundation* v. *United States*, 285 F. 2d 800 (Ct. Cl.), certiorari denied 368 U.S. 985; *Parker* v. *Commissioner*, 365 F. 2d 792 (C.A. 8), affirming in part a Memorandum Opinion of this Court, the publication and sale of the results of economic research, *American Institute For Economic Research* v. *United States*, 302 F. 2d 934 (Ct. Cl.), certiorari denied 372 U.S. 976, the operation of bingo games for the purpose of financing medical services for children, *Help the Children, Inc.*, 28 T.C. 1128, or the furnishing of medical services, *Lorain Avenue Clinic*, 31 T.C. 141; *Sonora Community Hospital*, 46 T.C. 519, affirmed per curiam 397 F. 2d 814 (C.A. 9). Moreover, the fact that the taxpayer may not have accumulated substantial funds but applied such funds instead to the development of its product does not adequately differentiate this case from those cited and distinguished by the majority. Indeed, to the extent that the taxpayer's exempt status permits it to finance the development of its product at a faster rate than its nonexempt competitors can develop theirs, the effect of the majority's decision may be to promote the very sort of anticompetitive advantage which Congress sought to eliminate in 1950.[2]

---

[1] In the *Fides* case the court stated (p. 935) :

"The exemption can only be denied, then, if the taxpayer is being operated for some non-exempt purpose which is substantial in nature. Such a purpose does exist. It may be described as the publication and sale of religious literature at a profit. In effect, the sole activity of Fides defines at least one purpose for which it is operated. It could not be otherwise. If it were, every publishing house would be entitled to an exemption on the ground that it futhers the education of the public."

[2] The majority states that "there is no evidence that petitioner used its exempt status to gain an unfair competitive advantage." The absence of such evidence is irrelevant to the issues now before this Court. In enacting the 1950 legislation, Congress sought to curb the anticompetitive harms generated by the exemption of income flowing from the active conduct of a commercial enterprise. However, the terms of that legislation are unconditional and do not require us to examine in each case whether the feared anticompetitive abuses have actually occurred. And in any event, the record discloses that the taxpayer devoted substantial sums to research and development, that its product was superior to those of its competitors, and that its manufacturing and sales operations were profitable even though its cones were relatively highly priced. Furthermore, even if the results of the taxpayer's research were made publicly available, such research (financed by the purportedly tax-exempt income) was probably more readily available to it and at an earlier time than to others and oriented toward the problems which *it* (rather than its competitors) encountered.

1. With regard to the majority's decision that the taxpayer is exempt from taxation, I would add the following: The majority, I fear, has too mechanically relied upon our prior decision in *Edward Orton, Jr. Ceramic Foundation*, 9 T.C. 533, affirmed 173 F. 2d 483 (C.A. 6), which in 1947 upheld the exempt status of the taxpayer now before us. There we relied heavily upon the then-current doctrine that the destination of an organization's income (i.e., for charitable purposes) was more important than its source (i.e., a commercial enterprise) in determining the organization's exempt status (9 T.C. at 540) :

The manufacture and sale of the standard cones was not the ultimate purpose of the foundation. That was merely a means of accomplishing its real purpose. The income from this business was to be used for financing the research work. In applying the exemption clause of the statute, the test is not the origin of the income, but its destination. *Trinidad* v. *Sagrada Orden de Predicadores*, 263 U.S. 578; *Roche's Beach, Inc.* v. *Commissioner*, 96 Fed. (2d) 776. * * *

However, in 1950 Congress enacted legislation designed to terminate the so-called "destination-of-income" test and thereby curtail the anticompetitive abuses which were thought to have developed under it: An exempt organization which conducted a business enterprise could charge lower prices, earn a higher rate of return, or invest its profits (unreduced by corporate taxation) in improvements at a faster rate than could its tax-paying competitors. H. Rept. No. 2319, 81st Cong., 2d Sess., pp. 36, 41 (1950) ; S. Rept. No. 2375, 81st Cong., 2d Sess., pp. 28, 35 (1950) ; see *Crosby Valve & Gage Co.* v. *Commissioner*, 380 F. 2d 146, 148–149 (C.A. 1), affirming 46 T.C. 641; *SICO Foundation* v. *United States*, 295 F. 2d 924, 926 (Ct. Cl.) ; *C. F. Mueller Co.*, 55 T.C. 275, 297–298. The approach taken in the 1950 legislation was two-pronged: (1) An organization which otherwise qualified for exemption as a charity but which was also engaged directly in the conduct of an active trade or business was to be taxed on its "unrelated business taxable income," that is, on income generated by activities not integrally related to the performance of the organization's exempt functions. (2) And where a charitable organization conducted an active trade or business indirectly through a "feeder" (a separately incorporated subsidiary), the feeder would be taxed in the same manner as competitive corporations. The underlying purpose was to tax commercial enterprises operated by charitable organizations on the same basis as their tax-paying rivals, regardless of whether such enterprises were operated directly as divisions of charitable organizations, or indirectly as separately incorporated feeders. The congressional effort was thus to deal comprehensively with the problems created by previously exempt organizations which had engaged in commercial activities, irrespective of differences in corporate structure. See H. Rept. No.

2319, 81st Cong., 2d Sess., p. 37 (1950) ; S. Rept. No. 2375, 81st Cong., 2d Sess., p. 29 (1950) :

Some of the witnesses who appeared before your committee took the position that this unrelated business income should be taxed only if received by a subsidiary organization. However, it is difficult to see why a difference in tax treatment should be allowed merely because in one case the income is earned directly by an educational or charitable organization, while in the other it is earned by a subsidiary of such an organization. In both cases the income is derived from the same type of activities and disposed of in the same manner. Moreover, in most cases the business functions now carried on by subsidiaries could be transferred to the parent if the tax were applied only to the income of the subsidiaries.

Thus, it is clear that Congress understood that it was taxing the income generated by a commercial enterprise regardless of the organizational mechanism that was selected as a means for carrying on that enterprise; it intended to leave no loophole. Notwithstanding the 1950 legislation, the majority today asserts that "there has been no change in the law" since the date of the first *Orton* case and concludes that it must rely upon our decision in that case.

To be sure, Congress did not amend section 101(6), I.R.C. 1939 (the statutory predecessor of section 501(c)(3)), in 1950. But by terminating the "destination-of-income" test and by attempting to remedy the anticompetitive advantages described above, Congress radically altered the entire statutory context. Accordingly, the weight to be accorded to the first *Orton* case must be evaluated in the light of that change. The correct principles to be applied in this situation are indicated by *Commissioner* v. *Sunnen*, 333 U.S. 591, which approved a different result for a later tax year from that reached in prior litigation for an earlier tax year in respect of the same taxpayer, the same controlling instrument and the same statutory language. Although the Supreme Court's opinion was focused upon res judicata and collateral estoppel, which it held to be inapplicable where there had been a significant change in "the legal atmosphere" (333 U.S. at 600) between the dates of the two cases, its decision of necessity represents a conclusion also that the doctrine of *stare decisis* is similarly inapplicable in such circumstances. The Court made clear that the change in "the legal atmosphere" might be wrought by any of a variety of circumstances, such as the rendition of a judicial declaration by a State court or the intervening development of legal principles by the Supreme Court itself (333 U.S. at 600) and that the earlier decision would likewise not have any binding effect if there were "an interposed alteration in the pertinent statutory provisions or Treasury regulations" (333 U.S. at 601).

Surely, the changes introduced by the 1950 Act and the accompanying extensive legislative history which made plain the intention of

Congress to tax the profits of a commercial enterprise regardless of the fact that they were committed to be paid out for charitable purposes represent as much a change in "the legal atmosphere" within the meaning of *Sunnen* as any of the other intervening events referred to in that opinion. In my judgment the change in "the legal atmosphere" created by the 1950 legislation was of such character as to call for reconsideration of the decision in the first *Orton* case. The majority avoids this task by asserting that to do so would amount to "judicial legislation." But the cry of "judicial legislation" in the context of this case merely raises a bugaboo. Congress did not decide the *Orton* case; that decision represents judge-made law. Indeed, far from codifying *Orton* in 1950, Congress terminated the "destination-of-income" test upon which that case relied. Accordingly, since the courts were the source of that judge-made law they have a particular responsibility for it. To wait for Congress to take care of a problem that the courts themselves have created is an abdication of that responsibility, and to characterize an exercise of that responsibility disparagingly as "judicial legislation" is hardly warranted in the circumstances of this case.

Equally remarkable is the majority's misuse of an excerpt from the following paragraph from the Senate Finance Committee's report (S. Rept. No. 2375, 81st Cong., 2d Sess., p. 29 (1950)) :

In neither the House bill nor your committee's bill does this provision deny the exemption where the organizations are carrying on unrelated active business enterprise, nor require that they dispose of such businesses. Both provisions merely impose the same tax on income derived from an unrelated trade or business as is borne by their competitors. In fact it is not intended that the tax imposed on unrelated business income will have any effect on the tax-exempt status of any organization. *An organization which is exempt prior to the enactment of this bill,* if continuing the same activities, *would still be exempt* after this bill becomes law. In a similar manner any reasons for denying exemption prior to enactment of this bill would continue to justify denial of exemption after the bill's passage. [Emphasis supplied.]

From the italicized fragments of the paragraph, the majority would infer that in enacting the 1950 legislation Congress intended that all organizations previously treated as tax-exempt would continue to be so treated. However, a fair reading of the entire paragraph reveals that the Finance Committee's intention was simply that if an organization were *otherwise entitled to exemption*, it would not *automatically* lose that exemption because it had unrelated business income. In passing upon the 1950 legislation, neither Congress nor the Finance Committee intended to freeze the exempt status of any specific organization which may have resulted from a prior judicial opinion based on criteria that are erroneous when considered in the light of the 1950 Act. We continue to have the responsibility for inquiring into the

validity of such individual exemptions, giving appropriate weight to the congressional objective reflected in the 1950 legislation.

*Forest Press, Inc.*, 22 T.C. 265, affords no basis for concluding that this responsibility has been discharged by the majority. That case involved a taxable year antedating the 1950 legislation. Moreover, the focus of that decision was upon the fact that although the terms of its certificate of incorporation did not restrict the scope of its activities, in fact the taxpayer was organized for and performed an exclusively noncommercial educational function. It is not without significance that *Forest Press, Inc.*, omitted any reference to our earlier *Orton* decision.

2. I would also note the following with regard to the majority's conclusion that the taxpayer was not the recipient of unrelated-business taxable income. By imposing a tax on only *unrelated*-business income of an otherwise bona fide exempt charitable organization, Congress attempted to avoid taxing business income derived from an exempt organization's activities which were necessarily and integrally part of the organization's exempt functions. Thus, the regulations, which follow the intent of Congress as reflected in the reports of the congressional committees, make explicit that the sort of activity intended to escape the tax is (1) a relatively small-scale enterprise (in comparison with the organization's charitable activities), (2) which is integrally related to the performance of the organization's exempt functions, and (3) which has as its primary purpose the advancement of such exempt functions. See Regs. sec. 1.513–2(a)(4) ; H. Rept. No. 2319, 81st Cong., 2d Sess., pp. 36–38 (1950) ; S. Rept. No. 2375, 81st Cong., 2d Sess. pp. 28–31 (1950). Here the taxpayer's activities were dominated by its manufacturing and sales operations. Moreover, the manufacturing and sales operations were conducted on a scale that far exceeded that which might have been appropriate to furthering the organization's scientific and educational purposes. They were hardly incidental or related to the taxpayer's charitable activities within the understanding of Congress or the terms of the regulations.

Furthermore, in my opinion, the majority's emphasis on the Commissioner's burden of proof in respect of this issue is unwarranted. There is no dearth of evidence in the record before us. The record contains ample evidence to support the Commissioner's position. Given such a record, the fact that the burden of proof is upon the Commissioner rather than the taxpayer is no justification for the result reached by the majority.

TIETJENS, TANNENWALD, and SIMPSON, *JJ*., agree with this dissent.