PULPIT RESOURCE, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 7976–77X.     Filed July 31, 1978.

Glendon E. Harris (an officer), for the petitioner.
*William J. Salica* and *Ray K. Kamikawa*, for the respondent.

OPINION

DRENNEN, *Judge:* This is an action for declaratory judgment pursuant to section 7428(a), I.R.C. 1954.[1]

Respondent issued a final adverse ruling on April 13, 1977, with respect to petitioner's application for exempt status under section 501(a) on the ground that petitioner's operation is similar to a commercial enterprise operated for profit and, therefore, is not operated exclusively for any of the purposes enumerated in section 501(c)(3). Petitioner has petitioned this Court for a declaratory judgment relating to its qualification as an organization described in section 501(c)(3). After answering the petition, respondent moved for summary judgment that Pulpit Resource as a matter of law is not an organization described in section 501(c)(3).

The issues presented herein are whether respondent's motion for summary judgment should be granted or denied, and, if denied, whether petitioner is entitled to a decision declaring it to be an organization described in section 501(c)(3) and exempt from tax under section 501(a).

This case was submitted for decision on the stipulated administrative record under Rule 122, Tax Court Rules of Practice and Procedure. The administrative record is incorporated herein by this reference. The evidentiary facts and representations contained in the administrative record are assumed to be true for purposes of this proceeding. The administrative record reveals the following.

Pulpit Resource (hereinafter referred to as petitioner), successor in interest to Crafted Sermons, was incorporated in

---

[1]All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise specified.

California on April 26, 1976, as a nonprofit corporation. Its stated purpose for incorporation was "To advance religious preaching through publication of sermons and other resources for ministers, priests, and rabbis, and to apply proceeds to purchase of preaching materials for libraries of selected schools of theology." The articles of incorporation further provide in pertinent part:

THAT THIS CORPORATION DOES NOT CONTEMPLATE PECUNIARY GAIN OR PROFIT TO THE MEMBERS THEREOF, AND THAT THE FUNDS OF THIS CORPORATION, WHETHER RECEIVED BY GIFT OR OTHERWISE AND REGARDLESS OF THE SOURCE THEREOF, SHALL BE USED EXCLUSIVELY IN THE PROMOTION OF THE ACTIVITIES OF THE CORPORATION, AS THE BOARD OF DIRECTORS MAY FROM TIME TO TIME DETERMINE.

\* \* \* \* \* \* \*

This corporation is organized in accordance with the provisions of Part I of Division 2, Title 1, Corporations Code, and does not contemplate pecuniary gain or profit to the members and no part of the earnings of which is to inure to the benefit of any member or individual.

That the property of this corporation is irrevocably dedicated to religious purposes and no part of the net income or assets of this corporation shall ever inure to the benefit of any director, officer or member thereof or to the benefit of any private persons. Upon the dissolution or winding up of this corporation, its assets remaining after the payment of, or provision for the payment of, all debts and liabilities of this corporation, shall be distributed to SCHOOL OF THEOLOGY at Claremont, California, if it is then in existence and exempt under Section 501(c)(3) of the Internal Revenue Code, but if not then in existence or exempt, to another organization which is organized and operated exclusively for religious purposes and which has established its tax exempt status under Section 501(c)(3) of the Internal Revenue Code.

The articles of incorporation were later amended at respondent's suggestion to include the following provision:

Notwithstanding any other provision of these articles, the corporation shall not carry on any other activities not permitted to be carried on (a) by a corporation exempt from Federal income tax under section 501(c)(3) of the Internal Revenue Code of 1954 (or the corresponding provision of any future United States Internal Revenue Law) or (b) by a corporation, contributions to which are deductible under section 170(c)(2) of the Internal Revenue Code of 1954 (or the corresponding provision of any future United States Internal Revenue Law).

Glendon E. Harris is president and a director of petitioner.

The Franchise Tax Board for the State of California exempted

Pulpit Resource from State franchise or income tax on April 22, 1976.

On May 7, 1976, Harris, as president of petitioner, filed with the Internal Revenue Service a Form 1023 (Application for Recognition of Exemption Under Section 501(c)(3) of the Internal Revenue Code) which states that the corporation's source of financial support is derived from subscriptions to a quarterly journal entitled "Pulpit Resource." The activities of the corporation were described as follows:

With a background in both religious journalism and preaching in the United Methodist Church, Glendon Harris began reprinting sermons, at the request of those hearing them, to distribute to others, clergy and laity alike. From that beginning in 1974 the demand has steadily grown to where the sermons reached out into a national and international distribution. The sermons were run off on the church offset press and mailed out on a quarterly basis at the rate of 25 cents a sermon.

In 1975, Mr. Harris took a Sabbatical Leave from the active pastorate to further his education and devote more time to the publication of sermons. In the latter part of 1975, a publication was formed to carry the sermons in its pages and to also include progress suitable for pulpit use and articles of general interest on preaching. The journal is called PULPIT RESOURCE * * *

The purpose of the publication is to advance the cause of religious preaching and sermonizing through the publication of model sermons, prayers, and material on preaching and sermon construction. The publication goes to ministers of all protestant denominations, Roman Catholic, and Jewish clergy. Contents are written by the editor with a select number of sermons and articles contributed by subscribing clergy.

Incorporation is sought now, under a non-profit status, in order to obtain franking privileges that will help achieve a wider circulation among the 160,000 clergy in the U.S. who could profit from this resource and improve the standard and quality of their preaching.

The gross receipts of Crafted Sermons in 1974 and 1975 were $9,349 and $17,056, respectively. Crafted Sermons had a net profit in 1974 of $3,687 and of $4,156 in 1975. Petitioner's projected budgets forecast:

Compensation of officers, directors, and trustees.

| Recipient | Position | Time devoted | Amount |
|---|---|---|---|
| Glendon E. Harris ........ | Editor | 40 hrs. + wk. | $15,000 |

PROJECTED BUDGET MAY-DEC.  1976                          1977

| | | |
|---|---|---|
| Anticipated receipts | $15,000 | $25,000 |
| Anticipated disbursements: | | |
| Office equipment | 163 | 200 |
| Rent of office | 167 | 250 |
| Travel | 80 | 700 |
| Telephone | 50 | 75 |
| Advertising | 750 | 2,000 |
| Postage | 500 | 1,200 |
| Printing | 2,000 | 3,000 |
| Mailing service | 400 | 600 |
| Office supplies | 150 | 250 |
| Auto expenses | 160 | 250 |
| Manuscript costs | 75 | 300 |
| Books | 30 | 100 |
| Salary to G. Harris | 10,000 | 15,000 |
| | 14,525 | 23,925 |

Donation to Claremont School of Theology Preaching Department (books and cash gift)........................1,075

Harris was the editor of Crafted Sermons and earned a salary of $3,687 in 1974 and $9,117 in 1975.

The subscription rates for Pulpit Resource are $12 for 1 year, $22 for 2 years, and $32 for 3 years. The letter from Harris soliciting subscriptions to Pulpit Resource by direct mail states:

ARE YOU THE KIND OF PREACHER WE'RE LOOKING FOR  . . .

One who truly loves to build quality sermons and preach them?

One who looks upon preaching as the flagship in his fleet of duties?

One who wants to improve sermonizing and preaching skills?

If you're that kind of preacher than [sic] we think we have something you've been looking for, too. It's a quarterly homiletical journal called PULPIT RESOURCE whose main purpose is "to advance the art of preaching." Now entering its fourth year, this ecumenical journal is praised and used in every state, Canada, and other English speaking countries. It is read and used by every Protestant denomination, as well as many Catholic, Orthodox, and Jewish clergy—many of them calling it "the best thing in the preaching field today."

Here's the kind of help it can bring you:

-Stimulating features on the art of preaching, written by preachers who

really know their profession. Articles that distill the pertinent in the field of preaching and sermonizing.

-At least six highly-crafted sermons in every issue. Sermons skillfully constructed through hours of research, Biblical scholarship, creative talent, and journalistic know-how. While they are not full-length sermons, they are well developed models that will give you approaches, ideas, and illustrative material to ignite your own creative efforts.

-Notes, quotes, and anecdotes on the preaching scene. Insights, tips, testimonials from premier preachers, past and present, who have spoken out of a deep affinity with preaching.

One user refers to PULPIT RESOURCE as "my continueing [sic] education course on preaching." And that's what it is designed to be as it brings to your desk the best material and models for you to work with. There's no advertising in PULPIT RESOURCE, just line upon line of solid material with substance and freshness which you will find amiable to your pulpit task.

Some sample pages from a recent issue are enclosed. In reading them closely we think you will see the intelligent, constructive, and creative approach PULPIT RESOURCE takes in contributing to the art of preaching.

There's a renaissance of good preaching today. You will want to keep up-to-date in your chosen field and improve your own skills at the same time. Just as doctors, attorneys, and other professionals keep abreast in their fields by surrounding themselves with the best information and the successful efforts of their colleagues, so we believe must the clergy.

This is not a profit-seeking organization and we have kept the subscription cost as low as possible to cover the expenses of producing the material and mailing it out. If you're the kind of preacher we're looking for, won't you join with us by returning the enclosed card today. Please be sure to enclose your check or money order as we're not set up for invoicing.

Petitioner also solicits subscriptions through advertisements in religious journals. However, the results from this method of advertising were disappointing and petitioner intends to rely primarily upon direct mail solicitation. Petitioner anticipates that it will obtain a maximum of 3,000 to 4,000 subscribers through direct mail solicitation.

In 1976 petitioner conducted the 1976 Sermon Awards after which the winning entries would be printed in Pulpit Resource. An entry fee of $5 was required and cash awards of $500 to $25, promised. Evidently intended to be an annual event, the purpose for the contest is "to encourage the creation of better sermons and to provide the means and incentive for clergy to devote themselves to developing better sermons."

Pulpit Resource does not carry advertising for other enterprises.

On July 13, 1976, respondent issued an adverse letter ruling on

petitioner's application for exempt status. The ruling states in part:

The information submitted indicates that you were incorporated in April, 1976 in California for the following purpose: "To advance religious preaching through publication of sermons and other resources for ministers, priests, and rabbis."

The sole activity of your organization is the publication and distribution of a quarterly publication entitled *Pulpit Resource*. This publication consists of model sermons, prayers, and material on preaching and sermon construction. The bulk of the material in the magazine is written by Mr. Harris, the founder of the organization.

At present there are 1,639 subscribers. Potential subscribers are made aware of the publication through direct mail advertising sent to churches, advertisements in religious journals, and word-of-mouth. The publication is available only by subscription at $12 per year.

Section 501(c)(3) of the Internal Revenue Code provides for recognition of exemption from Federal Income Tax for organizations organized and operated exclusively for religious, charitable or educational purposes.

Section 1.501(c)(3)–1(a)(1) of the regulations states that in order to be exempt as an organization described in section 501(c)(3), an organization must be both operated and organized exclusively for one or more of the purposes specified in that section.

Section 1.501(c)(3)–1(d)(1) of the regulations states that an organization is operated exclusively for the purposes set out in section 501(c)(3) of the Code only if substantially all of its activities are in furtherance of these purposes. An organization will not be so regarded if more than an insubstantial part of its activities are not in furtherance of an exempt purpose.

*Fides Publishers Association v. United States*, 263 F. Supp. 924 (1967), held that an organization whose sole activity was the publication and sale of religious literature at a profit was not entitled to exemption from Federal income tax for charitable, religious or educational purposes. Fides was an independent publishing operation having no official affiliation with any denomination. This organization advertised its publications in national Catholic magazines and engaged in direct mail advertising to assist sales.

*Scripture Press Foundation v. United States*, 285 F.2d 800 (1961), held that an organization that prepared and sold religious literature, in this case lesson-plan material for use in Sunday Schools, was not operated exclusively for religious or educational purposes. The Court found that the primary concern of the organization was the sale of religious publications and that the sale of these materials, however religiously inspired, involved the organization directly in the conduct of a trade or business for profit. The Court noted that there were numerous commercial organizations selling Bibles, scrolls and other religious or semi-religious literature which would not be entitled to exemption from Federal income tax for this part of their businesses. Scripture Press Foundation, a successor to Scripture Press, Inc., was not connected to any particular religious denomination or church.

From the information presented, it does not appear that Pulpit Resource, Inc. is operated exclusively for exempt purposes. The printing of religious

material is not *per se* a religious or educational activity. Publishing, printing, and distributing religious material through a commercial sales program by an organization not connected with a religious organization or church is not an exempt activity within the meaning of section 501(c)(3) of the Code. The operation of your organization closely resembles a commercial enterprise organized for profit. Pulpit Resource, Inc., appears to be an independent, profit-making publisher of specialized literature operated for a business purpose.

Based on the above, we conclude that you do not qualify for recognition of exemption under section 501(c)(3) of the Code. You are required to file Federal income tax returns on Form 1120 for each year that you have been in existence.

This ruling was affirmed after protest on August 24, 1976. Thereafter, this adverse ruling was reissued to petitioner on April 13, 1977, in order that petitioner be able to petition the United States Tax Court for declaratory judgment.[2]

The petition for declaratory judgment was timely filed and duly answered. However, on February 15, 1978, respondent moved for summary judgment alleging that the case was at issue under Rule 214, Tax Court Rules of Practice and Procedure, and that there is no dispute as to any material issue of fact.

The threshold question confronting us in this action for declaratory judgment is whether respondent's motion for summary judgment pursuant to Rule 121, Tax Court Rules of Practice and Procedure, should be granted or denied.

A motion for summary judgment shall be granted if the "pleadings, answers to interrogatories, depositions, admissions, and any other acceptable materials, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that a decision may be rendered as a matter of law." Rule 121(b), Tax Court Rules of Practice and Procedure. Because the pleadings are closed and the administrative record has been completely stipulated, respondent asserts that no material facts are in dispute. Hence, summary judgment is a proper procedure for disposition of this case.

Although we agree that summary judgment in an action for declaratory judgment is permitted by Rule 217(b)(2), Tax Court Rules of Practice and Procedure, we do not agree that it is the proper method of disposing of this case.

The basis for respondent's denial of tax-exempt status to

---

[2]Sec. 7428 applies to pleadings filed after Apr. 4, 1977.

petitioner in his letter ruling is that petitioner is not operated exclusively for an educational or charitable purpose as enumerated in section 501(c)(3) because its operations are similar to commercial enterprises operated for profit. This premise clearly raises a question of fact with regard to the purpose, nature, and extent of petitioner's activities and therefore precludes summary judgment. *B.S.W. Group, Inc. v. Commissioner*, 70 T.C. 352 (1978); *Chaum v. Commissioner*, 69 T.C. 156, 161 (1977); see also *Hoeme v. Commissioner*, 63 T.C. 18, 20 (1974).

Also, even though permitted by Rule 217(b)(2), Tax Court Rules of Practice and Procedure, a motion for summary judgment is superfluous in this action. Although petitioner sought to introduce further evidence at the hearing on the motion for summary judgment, petitioner's motion was denied and the case will be considered on the administrative record alone, as contemplated by Rule 217(a).[3] Rule 217(b)(1) further states that once the action has been submitted the Court will issue an opinion and declaratory judgment. And "Except in a case involving a revocation, the Court's decision will be based upon the assumption that the facts as represented in the administrative record as so stipulated or so certified are true and upon any additional facts as found by the Court if the Court deems that a trial is necessary."

Petitioner requested submission of this action pursuant to Rule 212, Tax Court Rules of Practice and Procedure.[4] Consequently, we will be able to render a declaratory judgment upon the petition, the answer, and the administrative record and respondent's motion for summary judgment is pointless. Consequently, respondent's motion is denied.

Turning to the action for declaratory judgment, section 7428(a) permits this Court under certain circumstances to

---

[3] Rule 217(a) states:

"Disposition of an action for declaratory judgment, which does not involve a revocation, will ordinarily be made on the basis of the administrative record * * * . Only with the permission of the Court, upon good cause shown, will any party be permitted to introduce before the Court any evidence other than that presented before the Internal Revenue Service and contained in the administrative record as so defined. * * * "

[4] Rule 212 states in part:

"After the action becomes at issue (see Rule 214), it will ordinarily, without any further request by the Court for information as to readiness for submission, be placed on a calendar for submission to the Court. See Rule 217(b)."

declare the correctness of a final determination by respondent that a corporation is not an organization described in section 501(c)(3) and therefore not exempt from tax under section 501(a).[5] The burden of proof is on petitioner to overcome the ground for denial of the exemption set forth in respondent's determination. Rule 217(c)(2)(i), Tax Court Rules of Practice and Procedure.

Sections 501(a) and 501(c)(3)[6] provide an exemption from Federal income tax for an organization devoted to charitable, religious, or educational purposes if three prerequisites are satisfied. Of these prerequisites only that requiring that the organization must be *operated* exclusively for religious, charitable, or educational purposes is at issue here. As noted, respondent denied exempt status because petitioner's operation is similar to a commercial enterprise operated for profit and therefore it is not operated exclusively for any of the purposes enumerated in section 501(c)(3). In so ruling respondent relied upon sections 1.501(c)(3)–1(a)(1) and 1.501(c)(3)–1(c)(1), Income Tax Regs., which provide that an organization is not operated exclusively for exempt purposes if more than an insubstantial part of its activities is not in furtherance of an exempt purpose.[7]

---

[5] Sec. 7428(a) provides in pertinent part:

(a) CREATION OF REMEDY.—In a case of actual controversy involving—
  (1) a determination by the Secretary—
    (A) with respect to the initial qualification or continuing qualification of an organization as an organization described in section 501(c)(3) which is exempt from tax under section 501(a) * * *

\*　　\*　　\*　　\*　　\*　　\*　　\*

upon the filing of an appropriate pleading, the United States Tax Court * * * may make a declaration with respect to such initial qualification * * * . Any such declaration shall have the force and effect of a decision of the Tax Court * * * and shall be reviewable as such.

[6] SEC. 501. EXEMPTION FROM TAX ON CORPORATIONS, CERTAIN TRUSTS, ETC.

(a) EXEMPTION FROM TAXATION.—An organization described in subsection (c) * * * shall be exempt from taxation under this subtitle unless such exemption is denied under section 502 or 503.

\*　　\*　　\*　　\*　　\*　　\*　　\*

(c) LIST OF EXEMPT ORGANIZATIONS.—The following organizations are referred to in subsection (a):

\*　　\*　　\*　　\*　　\*　　\*　　\*

(3) Corporations * * * organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, * * * no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting to influence legislation, (except as otherwise provided in subsection (h)), and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of any candidate for public office.

[7] Sec. 1.501(c)(3)–1(a)(1) states that:

"In order to be exempt as an organization described in section 501(c)(3), an organization must be both organized and operated exclusively for one or more of the purposes specified in such section. If an

The ruling also relies upon the holdings in *Scripture Press Foundation v. United States*, 285 F.2d 800 (Ct. Cl. 1961), cert. denied 368 U.S. 985 (1962), and *Fides Publishers Ass'n. v. United States*, 263 F. Supp. 924 (N.D. Ind. 1967). In denying the exemption the ruling states that:

> From the information presented, it does not appear that Pulpit Resource, Inc. is operated exclusively for exempt purposes. The printing of religious material is not *per se* a religious or educational activity. Publishing, printing, and distributing religious material through a commercial sales program by an organization not connected with a religious organization or church is not an exempt activity within the meaning of section 501(c)(3) of the Code. The operation of your organization closely resembles a commercial enterprise organized for profit. Pulpit Resource, Inc., appears to be an independent, profit-making publisher of specialized literature operated for a business purpose.

Although the letter ruling is not a masterpiece of clarity, we understand respondent's position to be that petitioner's commercial purpose (i.e., the sale of Pulpit Resource at a profit) is its predominant raison d'etre and, consequently, overcomes any other exempt purposes motivating the publishing activities. Apparently, respondent was not basing its adverse ruling on the ground that petitioner's stated purpose for organization was a nonexempt purpose.

Whether or not petitioner is operated exclusively for an exempt purpose presents difficult legal and factual questions. Several decisions have dealt with this aspect of the tax-exempt status of organizations which publish and sell religious literature and, as might be expected, have reached conflicting results. A review of the pertinent cases will highlight the tests used to resolve this issue.

In *Saint Germain Foundation v. Commissioner*, 26 T.C. 648 (1956), petitioner was organized and operated for the purpose of propagating the teachings of the "I AM" Religious Activity

---

organization fails to meet either the organizational test or the operational test, it is not exempt."
Sec. 1.501(c)(3)–1(c)(1) states:

"An organization will be regarded as "operated exclusively" for one or more exempt purposes only if it engages primarily in activities which accomplish one or more of such exempt purposes specified in section 501(c)(3). An organization will not be so regarded if more than an insubstantial part of its activities is not in furtherance of an exempt purpose."

Respondent's letter ruling refers to this regulation as sec. 1.501(c)(3)–1(d)(1) but the body of the ruling indicates that this is a typographical error.

through classes conducted throughout the United States and local sanctuaries established in various cities to pursue this faith. It also sold religious publications to students and members of the religious following which apparently produced a relatively small profit and income. Respondent argued that petitioner's receipt of income from the sale of its religious publications to its students and members of the religious following and from fees received in connection with certain annual conclaves indicated that petitioner was not operated exclusively for religious purposes. In rejecting this argument, we stated at page 658:

The sale of religious literature and the conclaves held to propagate the precepts of the petitioner are activities closely associated with, and incidental to, the religious purposes of the petitioner. Such activities bear an intimate relationship to the proper functioning of the petitioner, and we do not believe that income received from these activities prevents the petitioner from being an organization organized and operated "exclusively" for religious purposes * * *

However, the Court of Claims in *Scripture Press Foundation v. United States, supra,* examined the tax-exempt status of an organization devoted to the preparation and sale of religious literature on a nondenominational basis. The organization also conducted door-to-door evangelism and instructional activities. Relying upon the test set forth in *Saint Germain Foundation v. Commissioner, supra,* but reaching a contrary result, the court queried whether the sale of religious literature was incidental to the organization's religious purposes or whether its religious purposes were incidental to the sale of religious literature.[8] Because the organization's materials were competitively priced and the sales over a 7-year period yielded substantial accumulated profits which greatly exceeded the amount expended for instructional activity, the Court of Claims concluded that the sale of religious literature was the primary concern of the organization's activities. It further concluded that the sale of the materials, although religiously inspired, involved the organization directly in the conduct of a trade or business for profit and therefore it was not operated exclusively for religious purposes. The court disposed of the argument that the organization was

---

[8]See also *Foundation for Divine Meditation, Inc. v. Commissioner,* T.C. Memo. 1965–77, affd. in relevant part sub nom. *Parker v. Commissioner,* 365 F.2d 792 (8th Cir. 1966), cert. denied 385 U.S. 1026 (1967).

operated exclusively for educational purposes on the same ground.

*Fides Publishers Ass'n. v. United States, supra,* involved the tax-exempt status of an organization formed to propagate the "Catholic Action" movement in the United States. During the taxable year at issue, 1958, Fides published 22 books which were priced to return a profit. Net profit during the taxable year at issue was $97,542.12. Fides advertized its publications in Catholic magazines and by direct mailings. Contributions to charity by Fides during the taxable year at issue totaled $2,000 as compared to an inventory on hand valued at $114,369.41 and net sales of $221,048.79 as compared to net sales of $9,097.44 in 1950. Petitioner, relying on *Saint Germain Foundation v. Commissioner, supra,* argued that it was operated exclusively for tax-exempt purposes because the end for which its publication activity was undertaken was a tax-exempt purpose. The Court distinguished *Saint Germain Foundation v. Commissioner, supra,* on the ground that that case dealt with an organization only a part of whose activities was commercial in nature. It was assumed in that case that the organization was operated only for exempt purposes and broached only the question of whether the commercial activities were carried on in furtherance of those purposes. Fides, the court determined, was an organization whose sole activity was the carrying on of a trade or business. Hence, the question became whether the purposes for which Fides operated its publishing business were tax-exempt purposes. In answering this question the court relied on the statement in *Better Business Bureau v. United States,* 326 U.S. 279, 283 (1945), that:

in order to fall within the claimed exemption, an organization must be devoted to [exempt] * * * purposes exclusively. This plainly means that the presence of a single [nonexempt] * * * purpose, if substantial in nature, will destroy the exemption regardless of the number or importance of truly [exempt] * * * purposes. * * *

Although the court in *Fides* conceded that the publishing activities further the exempt purpose of educating the lay apostulate, it concluded:

The exemption can only be denied, then, if the taxpayer is being operated for some non-exempt purpose which is substantial in nature. Such a purpose does exist. It may be described as the publication and sale of religious literature at a profit. In effect, the sole activity of Fides defines at least one

purpose for which it is operated. It could not be otherwise. If it were, every publishing house would be entitled to an exemption on the ground that it furthers the education of the public.

* * * * * * *

To deny that Fides, an independent, profit-making publisher of specialized literature, is operated for a business purpose, is to avoid reality. Having no other function, that purpose must be ascribed to it notwithstanding sincere disclaimers of any such intent. * * * [263 F. Supp. 935–936.]

.The organization seeking tax-exempt status in *Elisian Guild, Inc. v. United States*, 412 F.2d 121 (1st Cir. 1969), revg. 292 F. Supp. 219 (D. Mass. 1968), was organized to publish and disseminate the nonsectarian writings of a particular woman. This publishing activity constituted the organization's sole activity. For most of the years of its existence, it operated in the red although its operations did show a profit in one year as the result of a sale of a capital asset. Noting that in *Scripture Press Foundation v. United States, supra,* and *Fides Publishers Ass'n. v. United States, supra,* the amounts received from sales of the publications were substantial and had increased over a period of time, the court questioned whether Elisian Guild, Inc., had a substantial nonexempt purpose for its publishing activities, i.e., the sale of its publications at a profit. The court concluded that the deficit operation reflected not poor business planning nor ill fortune but the fact that profits were not the goal of the operation. The court further stated at page 125:

the very smallness of the Guild's operations shows how inapplicable is the reasoning in *Fides* and *Scripture Press* * * * . In 1962 the Guild sold 313 books for $615.70. Also five books were given away. This was in no way unusual, the sale of about 400 books a year being typical. We do not suggest that the small scale of an operation is an infallible index of exempt purpose any more than we asserted as much for failure to show a profit. We merely note that when it is claimed that an exempt purpose is swallowed up in the fact of a thriving business operation, it is pertinent to inquire how big a swallow a $600 a year operation can be expected to take.[9]

In *American Institute for Economic Research v. United States*, 302 F.2d 934 (Ct. Cl. 1962), the organization seeking tax-exempt status therein researched and published economic and investment information in 2 semi-monthly periodicals and in weekly research reports available by subscription and conducted an

---

[9]Cf. *Orton v. Commissioner*, 56 T.C. 147, 159 (1971).

investment advice service for a fee. Receipts from subscriptions during the taxable years involved totaled $503,611.85. The corporate bylaws required that these profits be expended to further the scientific and educational purposes of the institute. Citing *Scripture Press Foundation v. United States, supra,* the Court of Claims stated at page 938:

> Our approach, then, is to first assume *arguendo* an educational purpose without giving definitive meaning to that concept, and next ascertain whether or not the taxpayer has an additional commercial purpose. Should the answer to the latter inquiry be affirmative, we must decide whether the commercial purpose is primary or incidental to the exempt purpose. That on the facts before us the answer to the first question is affirmative requires no extensive discussion. The difficult question is whether the commercial purpose is primary.

The court then noted that the amounts received for the publications were above their cost of production and that the service offered by plaintiff is one commonly associated with a commercial enterprise. In response to plaintiff's argument that the subscriptions were charitable contributions, the court pointed out that the receipt of full value in exchange for its contributions precludes acceptance of this contention. It then stated (at page 938) that:

> In order for plaintiff to obtain its "contributions," it must proffer something valuable in return. This necessity or purpose to provide such information and service as would be desired by the public places plaintiff in competition with other commercial organizations providing similar services. Plaintiff has chosen to compete in this manner and, as a consequence, plaintiff's activities acquire a commercial hue.

One further recent case decided by this Court, while not involving an organization which published and sold religious literature, is pertinent and helpful, being *B.S.W. Group, Inc. v. Commissioner, supra.* There the petitioner was organized for the purpose of providing consulting services, mostly to charitable organizations in rural-related policy and program development. The services, which were petitioner's sole activity, were provided for fees that returned to petitioner slightly more than their cost. It had no other source of income. Upon petitioner's application for exempt status, respondent issued an adverse ruling. Respondent did not dispute that petitioner was organized exclusively for the required purposes (the "organizational test") but determined that petitioner did not meet the "operational test"

since it was "primarily engaged in an activity which is characteristic of a trade or business."

In sustaining respondent's ruling the Court said:

Under the operational test, the purpose towards which an organization's activities are directed, and not the nature of the activities themselves, is ultimately dispositive of the organization's right to be classified as a section 501(c)(3) organization exempt from tax under section 501(a). * * * Petitioner is engaged in * * * only one activity, but it is possible for such an activity to be carried on for more than one purpose. * * * The fact that petitioner's activity may constitute a trade or business does not, of itself, disqualify it from classification under section 501(c)(3), provided the activity furthers or accomplishes an exempt purpose. * * * Rather, the critical inquiry is whether petitioner's primary purpose for engaging in its sole activity is an exempt purpose, or whether its primary purpose is the nonexempt one of operating a commercial business producing net profits for petitioner. * * * This is a question of fact to be resolved on the basis of all the evidence presented by the administrative record. * * * [Citations omitted.]

After reviewing the facts in the light of various factors deemed relevant to the determination the Court reluctantly concluded that it was "unable to find that petitioner's primary purpose [was] educational, scientific, or charitable, rather than the conduct of an ordinary commercial consulting enterprise in competition with other commercial firms."

With these decisions as guidance to the meanings of "operated exclusively" in section 501(c)(3), we turn to the facts and arguments presented in the administrative record and briefs. While the question is close, and of necessity our decision is based only on the facts established in the administrative record of this case, we conclude that petitioner was organized and operated exclusively for religious, educational, and charitable purposes and qualifies for exemption under Code section 501(a) and (c)(3).

The sole activity of petitioner at the time exempt status was sought was the publication and sale of Pulpit Resource.[10] There is no question that the publishing activities further its purpose of improving the preaching skills and sermons of the clergy of Protestant, Roman Catholic, and Jewish faiths. As Harris explained:

---

[10]In its appeal of respondent's initial ruling petitioner states that funds received from subscriptions in excess of the cost of production and Harris' salary also will be used to develop educational projects in preaching and sermonizing with the School of Theology at Claremont. The program, petitioner stated, is projected to take the form of seminars, weekend conferences, scholarship assistance, and purchase of books on homiletics for the preaching department of the library.

The thrust of the whole program is to educate through "how to" articles in the publication, along with sermon models showing successful approaches and development of Biblical tests and topics. As the periodical is able to expand, more and more "how to" articles will be included, to educate the clergy to do a more effective job in their most important area of endeavor * * * the weekly worship service.

As we understand respondent's position from his ruling letter and his briefs, he does not dispute that petitioner was "organized" for a charitable purpose. This should be sufficient to meet the "organizational test," see *B.S.W. Group, Inc. v. Commissioner, supra,* and *American Institute for Economic Research v. United States, supra* at 938, but we add that we believe petitioner's stated purpose for incorporation, i.e., "to advance religious preaching through publication of sermons and other resources for ministers, priests, and rabbis, and to apply proceeds to purchase of preaching materials for libraries of selected schools of theology" qualifies as a religious purpose. This being so, it follows that insofar as petitioner's activity furthered that purpose, petitioner was "operated" in part, at least, for religious purposes.[11] But, as noted above, a single activity may be carried on for more than one purpose, and if the other purpose is commercial in nature, a nonexempt purpose, the critical inquiry is whether the primary purpose for engaging in the sole activity is the exempt purpose or the nonexempt purpose; whether the nonexempt purpose was primary or merely incidental to the exempt purpose.

We do not believe it can be gainsaid that petitioner's sole activity had a commercial or business hue—it was selling religious literature to clergy. Subscriptions for its product are obtained by advertising and direct mail solicitation. Potential subscribers include approximately 160,000 clergy in the United States plus an undetermined number in other English speaking countries. Petitioner anticipates that 3,000 to 4,000 subscriptions will be obtained through direct mail solicitation, its most successful form of advertising, although Pulpit Resource itself does not contain advertising from other sources and no income is realized that way. Although subscription prices are kept as low

---

[11]See *Golf Life World Entertainment Championship, Inc. v. United States* (D.C. Cal. 1964, 15 AFTR 2d 307, 65–1 USTC par. 9174), wherein the court said: "it seems well settled that an organization need not engage in a functional charitable activity to be organized and operated for charitable purposes within the meaning of section 501(c)(3)." See also Rev. Rul. 64–182, 1964–2 C.B. 186.

as possible, Pulpit Resource is not sold at or below cost. Its net profit for 1977, after allowance of a $15,000 salary for Harris, is projected to be $1,075.[12] This in itself suggests a commercial as opposed to a charitable purpose (*Scripture Press Foundation v. United States, supra*), although it has been recognized that it is often necessary for an organization to earn a profit from a business activity in order to carry out its charitable purpose. *Trinidad v. Sagrada Orden,* 263 U.S. 578 (1924). The record indicates that petitioner's projected net profit for 1977 will be donated to the Preaching Department of the School of Theology at Claremont.

Having found that petitioner's sole activity had a dual purpose, we must determine whether the nonexempt commercial aspect of the activity was either so independent of the religious purpose or was sufficiently substantial that it cannot be said that petitioner was "operated exclusively" for religious purposes. *Fides Publishers Ass'n. v. United States, supra; Better Business Bureau v. United States, supra.* The fact that petitioner intended to make a profit, alone, does not negate that petitioner was operated exclusively for charitable purposes. *Saint Germain Foundation v. Commissioner, supra.* If the sale of religious literature was an integral part of and incidental to petitioner's avowed religious purpose, that activity may be considered a part of the religious purpose or objective. *Elisian Guild, Inc. v. United States, supra.* We find that it was.

Apparently the only way petitioner could accomplish its objective of disseminating sermons to ministers to improve their religious preachings was by selling Pulpit Resource at a price sufficient to pay for its cost and provide Harris with a reasonable salary. It apparently received few, if any, contributions and a contest for best sermons met with little financial success. There is no evidence that petitioner was in competition with any commercial enterprise conducting the same business activity. The market for petitioner's product was so limited in scope that it would not attract a truly commercial enterprise. While petitioner projected a profit from its sales for 1977, the amount was small and it was dedicated to be used for religious purposes. While the "destination-of-income test" of *Trinidad v.*

---

[12]Harris' salary is not a fixed amount. It may fluctuate with the amount of net income after other costs but it is not projected to be higher than $15,000 per annum.

*Sagrada Orden, supra,* may have been sapped of some of its efficacy by the enactment by Congress in 1950 of the unrelated business income provision (see dissenting opinion of Judge Raum in *Orton v. Commissioner,* 56 T.C. 147 (1971), but see *Fides Publishers Ass'n. v. United States, supra*), the fact that petitioner dedicated all of its property and funds to religious purposes is relevant evidence that petitioner's activity was not conducted for a commercial purpose. *Fides Publishers Ass'n. v. United States, supra.* And while it is possible that Harris could drain off profits in salary in the future, we believe it is unlikely because he receives no royalties from his own sermons that are sold and the administrative record reflects his sincerity and devotion to religious concepts. While we recognize that the intensity of the religious convictions of the members of an organization cannot operate to exempt it if the activities of the organization do not justify the exemption (*Scripture Press Foundation v. United States, supra*), we believe Harris' sincerity and devotion are entitled to consideration in determining the relative importance of petitioner's purposes. If the above circumstances change materially in the future, so might a ruling on petitioner's exempt status.

We do not find that any of the cases relied on by petitioner and respondent, most of which we have discussed above, are decisive of our conclusion in this case.[13] Accepting the principles established in those cases it is apparent that the relevant facts in each individual case must be strained through those principles to arrive at a decision on the particular case. Following that procedure and accepting as true the facts established by the administrative record in this case, we have concluded that petitioner, on the basis of those facts, was organized and

---

[13]Respondent's intimation that the nondenominational character of Pulpit Resource is a persuasive factor in his favor is not borne out by the cases cited above. The publications involved in *Elisian Guild, Inc. v. United States,* 412 F. 2d 121 (1st Cir. 1969), revg. 292 F. Supp. 219 (D. Mass. 1968), were nonsectarian but exempt status was upheld. In *Fides Publishers Ass'n. v. United States,* 263 F. Supp. 924 (N.D. Ind. 1967), the publications definitely were related to the Roman Catholic religion but exempt status was denied. The focus is upon whether the organization's activity is intended to make a profit and whether this intention is the primary purpose for the activity. Whether or not a particular publication is directed toward a specific religion does not enter into this inquiry.

operated exclusively for religious and charitable purposes and qualifies as an exempt organization under section 501(c)(3) of the Code.

*Decision will be entered for the petitioner.*