JUNALUSKA ASSEMBLY HOUSING, INC., PETITIONER *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2394-85X.          Filed May 28, 1986.

*Michael L. Miller*, for the petitioner.
*Jeremy Nowak*, for the respondent.

OPINION

WILLIAMS, *Judge:*\* The Commissioner determined that petitioner does not qualify for exemption from Federal income taxation under section 501(a)[1] as an organization

---

\*By order of the Chief Judge, this case was reassigned to Judge Williams for decision and opinion.

[1] All section references are to the Internal Revenue Code of 1954 as amended and in effect during the period before us, unless otherwise indicated.

described in section 501(c)(3) and that petitioner is not a "church" within the meaning of section 170(b)(1)(A)(i) for purposes of determining its status as a private foundation under section 509(a)(1). Pursuant to section 7428, petitioner seeks a declaratory judgment of this Court that it is an exempt organization described in section 501(c)(3) and that it is not a private foundation under both section 509(a)(1) and section 509(a)(3).[2]

These issues are presented to this Court for decision: (1) Whether petitioner qualifies as an exempt organization under section 501(c)(3); and, if so, (2) whether this Court has jurisdiction under section 7428 to decide petitioner's claims for classification under sections 509(a)(1) and 509(a)(3); and, if so, (3) whether petitioner can be so classified. If we find that petitioner is an exempt organization described in section 501(c)(3) and that we have jurisdiction to hear petitioner's claims for classification under section 509(a)(3), respondent concedes that petitioner is an organization that is not a private foundation under section 509(a)(3).

This case was submitted for our decision on the stipulated administrative record pursuant to Rules 122 and 217(b).[3] The evidentiary facts and representations contained in the administrative record are assumed to be true. Rule 217(b)(1). Petitioner Junaluska Assembly Housing, Inc. (Housing) is a nonprofit, nonstock corporation formed under the laws of the State of North Carolina on December 17, 1982. Petitioner's principal office was at Lake Junaluska, North Carolina, at the time the petition was filed.

Housing is an auxiliary of the United Methodist Church (the church). In 1980, the church had approximately 9.5 million members in the United States. Its highest ecclesiastical body is the General Conference, under which are five Jurisdictional Conferences. The Southeast Jurisdictional Conference of the church controls Lake Junaluska Assembly, Inc. (the Assembly) and selects a majority of its trustees. The Assembly is also an auxiliary of the church and is itself a church. The church has a group ruling recognizing it as an exempt organization under section

---

[2] On Oct. 31, 1984, the respondent issued his final adverse ruling to petitioner. The petition was timely filed with the Court pursuant to sec. 7502.

[3] All rule references are to the Tax Court Rules of Practice and Procedure.

501(c)(3) and as a church for purposes of sections 170(b)(1)(A)(i) and 509(a)(1). The Assembly is covered by the group ruling.

The Assembly owns and operates the conference and retreat center for the church's Southeast Jurisdictional Conference. The conference center's grounds consist of 1200 acres of land surrounding Lake Junaluska in North Carolina. The grounds are improved with a large auditorium (seating approximately 2260), chapel, dining halls, overnight quarters, and other support facilities.

In 1910, a missionary board of the church chose the site of the assembly grounds for "the various conferences of our church when desirable to hold them there, and for Bible Institutes and such other organizations for the help of the preachers and laymen and the general upbuilding of the Church and her forces as may be decided upon in our onward movement for the evangelization of the world." The assembly grounds are located in the beautiful surroundings of the mountains of western North Carolina. The Assembly operates and maintains the grounds and facilities for conventions, meetings, and seminars of the church, services, ceremonies, prayer meetings, religious instruction, and other religious activities.

Current residents of the assembly grounds provide necessary and valuable services in connection with the religious programs of the church at the assembly grounds, including: the conduct of worship services and delivery of sermons; the teaching of confirmation classes; the presentation of lectures and other religious programs; the provision of spiritual counseling; the organization of various religious activities on the assembly grounds; participation in the Assembly's choir; service as ushers, greeters, and hostesses; the housing of visitors to the assembly grounds; the provision of transportation services for participants in the Assembly's programs; the administration of weddings, communion, and other activities at the chapel; the administration of the Methodist Historical Society; the providing of office and clerical assistance with respect to the Assembly's programs; the administration of many fund-raising efforts for the assembly grounds; physical maintenance of the assembly grounds; and the provision of a telephone network

of residents having technical skills to assist in the administration of the assembly grounds.

The Assembly considers "the continued growth of a spiritual community on the assembly grounds to be vital to the attainment of the objectives of the Assembly." The Assembly considers additional housing on the assembly grounds essential to fostering the growth of that spiritual community.

Rather than constructing the housing itself, the Assembly formed petitioner as a separate corporation to avoid liability under North Carolina's construction liability laws. The principal purpose of Housing is to contract for the construction of temporary and permanent housing at the assembly grounds.

Section 3 of Housing's articles of incorporation provides that its purposes are "to operate exclusively for religious, charitable, and educational purposes as referred to in Section 501(c)(3) of the Internal Revenue Code of 1954," and further:

To provide support and assistance to the Southeast Jurisdiction of the United Methodist Church and the organizations and entities supporting its objectives, including Lake Junaluska Assembly, Incorporated (hereinafter referred to as the"Assembly"), to advance the membership of such Church, to assist in the expansion of the Church's programs and functions at the assembly grounds located at the Assembly, and to provide facilities and housing at the Assembly for members of the clergy of the United Methodist Church, laypersons who are members of such Church, and other persons and legal entities who are interested in and supportive of the aims and objectives of the Church and the Assembly.

The articles of incorporation also provide that the corporation may plan, develop, contract, sell, and lease condominiums for single and multifamily housing on the assembly grounds but only to the extent such practices are consistent with the purposes enumerated above.

The seven directors of Housing must be members of the Southeastern Jurisdictional Conference of the Church and are appointed by the president of the board of trustees of the Assembly. Each of the board members of Housing is also a director and/or trustee of the Assembly. While the directors and officers of Housing may be compensated for services performed, the record states that all directors and officers were working as volunteers at the time petitioner's

application for exemption was filed. Housing's chairman of the board also serves as its president, the secretary of the board serves as Housing's secretary, and Housing's vice president and treasurer are selected from among its board members. Housing's articles of incorporation provide that no part of the net earnings of the corporation are to inure to the benefit of any director, officer, or private individual, but reasonable compensation for services rendered may be paid. On dissolution, Housing's assets remaining after payment of liabilities are to be distributed to organizations of similar purposes that are exempt under section 501(c)(3), including the church and the Assembly.

On its Form 1023 (Application for Recognition of Exemption) Housing estimated gross revenues of $3.9 million for 1984 and of $3.8 million for 1985, and net revenues of $357,952 for 1984 and of $348,500 for 1985. The surplus, if realized, would be used to pay for unidentified "other expenses." No further explanation of the estimated surpluses and expenses was provided.

Housing, pursuant to its declared purposes, has planned the development of single family, noncommercial residences on 7.42 acres of the assembly grounds. The land was purchased from the Assembly by deed dated March 29, 1984, and is situated at the perimeter of the assembly grounds but near the conference center and chapel. The project calls for the construction of 12 buildings containing a total of 56 condominium units to be built in three phases. These units will be sold at their fair market values in a range of $72,500 to $83,500. Petitioner has neither advertised nor solicited buyers of the units. It will not market the units through a real estate agent or broker. Petitioner intends to offer the facilities only to those participating in or supportive of the activities of the Assembly.

In response to inquiries from interested individuals, petitioner sent out 175 housing applications-questionnaires. The questionnaire asks whether the applicant is a member of the church and whether the dwelling is intended for use as a principal residence, retirement home, summer home, or for other purposes. The questionnaire also asks for the name and telephone number of the applicant's pastor, for certain financial information, and for amenities the appli-

cant would like the condominium unit to have. By July 1984, Housing had a list of 18 individuals who had reservations for condominium units.

The buyer's agreement between Housing and the potential buyer states that the buyer acknowledges petitioner's goal of developing "a community of congenial residents whose aims and purposes are those" which are consistent with the goals of the Assembly and petitioner, as set forth in the deed of March 29, 1984, from the Assembly to petitioner, and states that the buyer will be screened with these purposes in mind. The deed states as follows:

First: That the town in which said land is located called "Lake Junaluska" is a community, the aims, objects and purposes of which are health, rest, recreation, Christian work and fellowship, missionary and school work, and other operations auxiliary and incidental thereto.

Second: That said lands shall be held, owned, and occupied subject to the provisions of the charter of the Grantor, and all amendments thereto, heretofore, or hereafter enacted, and to the by-laws and regulations, ordinances and community rules which have been, or hereafter may be, from time to time, adopted by Grantor, and its successors.

A buyer will purchase the housing unit subject to a right of first refusal in the Assembly. Prior to agreeing to resell his housing unit, the owner must offer the unit to the Assembly for the lowest acceptable selling price. After receiving the terms in writing, the Assembly has 30 days within which to purchase the unit or to furnish a purchaser. All subsequent purchasers are bound to give the Assembly the same right of first refusal. The Assembly acts as rental agent should the owner desire to lease the unit.

A homeowners association will administer the property and will pay for maintenance and repairs of common areas of the condominium property and other common expenses. Its fees will be paid by its owner-members. Each homeowner is also responsible for an annual service fee to Housing of $250—to cover such items as lighting of outside areas, garbage and snow removal, and common area maintenance of the assembly grounds—and an annual membership fee of $100 to the Assembly—to participate in recreational and other activities on the assembly grounds. Unless the petitioner approves the mortgagee, unit owners may mortgage their units only to a public lending institution.

The capital of Housing at the time its application for exemption was submitted consisted of a contribution to capital from the Assembly of $25,000, of which approximately $21,000 was expended for survey, appraisal, legal, and other expenses. Subsequent revenues will come from the sale of the condominium units.

On June 28, 1983, petitioner filed an application for recognition of exemption from Federal income taxation (Form 1023) under section 501(c)(3). On its Form 1023, petitioner indicated that it sought a definitive ruling under sections 170(b)(1)(A)(i) and 509(a)(1) of its status as a church and as an organization that is not a private foundation. Petitioner also indicated that it was described in section 509(a)(2) and in section 509(a)(3). On April 25, 1984, respondent issued its proposed adverse ruling concluding that petitioner was not (i) an exempt organization described in section 501(c)(3), (ii) a church within the meaning of section 509(a)(1), or (iii) an organization described in section 509(a)(2) or section 509(a)(3). In its final adverse letter ruling of October 31, 1984, respondent denied petitioner exempt organization status under section 501(c)(3) and denied that petitioner qualified as a church within the meaning of sections 509(a)(1) and 170(b)(1)(A)(i), as follows:

> You have failed to establish that you are operated exclusively for exempt purposes as required by section 501(c)(3). Your activities as developer of the Tri-Vista Villas condominium complex are in furtherance of a substantial, non-exempt purpose. You serve private rather than public purposes in more than an insubstantial manner. Furthermore, even if you were an organization described in section 501(c)(3), you are not a church within the meaning of section 509(a)(1) and 170(b)(1)(A)(i).

Respondent's final adverse ruling did not address petitioner's claims that it was an organization that was not a private foundation pursuant to either section 509(a)(2) or section 509(a)(3). In an amendment to his answer, respondent concedes that petitioner is an organization described in section 509(a)(3) if we hold it to be an organization described in section 501(c)(3). It is on this record that petitioner seeks a declaratory judgment pursuant to section 7428.

The central issue of this case is whether petitioner is exempt from Federal income tax pursuant to section 501(a)

as an organization described in section 501(c)(3).[4] Petitioner must satisfy two tests: (1) An organizational test and (2) an operational test, i.e., petitioner "must be both organized and operated exclusively for one or more of the purposes specified" under section 501(c)(3). Sec. 1.501(c)(3)-1(a)(1), Income Tax Regs. Respondent concedes and the record confirms that petitioner satisfies the organizational test. The point of controversy between the parties is whether petitioner is operated exclusively for exempt purposes.

Being operated "exclusively" for an exempt purpose means that the exempt purpose for which the organization is operated is substantial (*Better Business Bureau v. United States*, 326 U.S. 279 (1945)), and that any nonexempt purpose of the organization is merely incidental. *Copyright Clearance Center, Inc. v. Commissioner*, 79 T.C. 793 (1982). The purposes for which an organization is operated are discerned not from the organization's activities but from the end for which those activities are undertaken. *Golden Rule Church Association v. Commissioner*, 41 T.C. 719, 728 (1964). Even if petitioner's activities would normally constitute a trade or business, petitioner will not be disqualified so long as its activities further an exempt purpose (*B.S.W. Group v. Commissioner*, 70 T.C. 352, 357 (1978)), and the organization serves public rather than private interests, i.e., no benefit inures to a private individual, shareholder, or other private interest. Sec. 1.501(c)(3)-(1)(c)(2), Income Tax Regs. If the organization's activities accomplish an exempt purpose and if no more than an insubstantial part of its activities accomplish nonexempt purposes, then petitioner

---

[4]Secs. 501(a) and 501(c)(3) provide in pertinent part:

SEC. 501. EXEMPTION FROM TAX ON CORPORATIONS, CERTAIN TRUSTS, ETC.

(a) EXEMPTION FROM TAXATION.—An organization described in subsection (c) * * * shall be exempt from taxation under this subtitle unless such exemption is denied under section 502 or 503.

* * * * * * *

(c) LIST OF EXEMPT ORGANIZATIONS.—The following organizations are referred to in subsection (a): * * *

(3) Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious * * * purposes * * * no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting to influence legislation, (except as otherwise provided in subsection (h)), and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of any candidate for public office.

will be considered to be operated exclusively for exempt purposes. *Aid to Artisans, Inc. v. Commissioner*, 71 T.C. 202 (1978). Thus it is the purpose for which the organization was established that is the central focus of the Court's inquiry.

Whether Housing is operated for exempt purposes depends on whether the housing units are to be constructed, sold, and used to further the exempt purposes of the Assembly. If the housing provides either a recreational center for enjoyable living or vacation homes other than as may be incidental to the participation of the occupants in the Assembly's activities, a substantial nonexempt purpose would be served. Petitioner must satisfy us that, unlike the retreat center that was the subject of *Schoger Foundation v. Commissioner*, 76 T.C. 380 (1981), the housing it will provide is predominantly to aid and to enhance the religious purposes of the Assembly.

As a new organization just beginning to operate, Housing has a limited history to examine for telltale signs of activity undertaken for nonexempt purposes. It is, however, controlled by and an integral part of the Assembly, which has a history of more than 75 years of serving the religious purposes of the church. Since 1910, the church has used the assembly grounds at Lake Junaluska as a gathering place of missionaries on leave, retired clergy, active laymen and pastors for religious services, religious seminars, and religious training. The record indisputably shows that the Assembly, an exempt organization and a church, operates the retreat facilities for religious purposes and that additional housing is essential to its continuing ability to fulfill those purposes. Respondent has not challenged the Assembly's exempt status or alleged that its activities further a substantial nonexempt purpose. Petitioner was formed to construct, sell, or lease the Assembly's needed additional housing.

Respondent points to the beautiful surroundings of Lake Junaluska and the recreational facilities available to residents at the assembly grounds as indicators that the housing to be constructed at the assembly grounds is primarily to provide an enviable vacation spot not unlike others situated in the neighboring Smokey Mountains. The

tax law, however, does not require churches to hold their retreats or other gatherings for religious purposes in the wilderness or to eschew recreation incident to gatherings held primarily for religious activity. Nevertheless, respondent's suspicions are not without some merit, and our inquiry cannot end with our conclusion that petitioner intends to provide the housing necessary to fulfill the religious purposes of the Assembly. The key to petitioner's exemption is that the predominant use of the housing units to be constructed is inextricably tied to the religious activities of the Assembly. *Schoger Foundation v. Commissioner*, 76 T.C. at 388. If petitioner's housing units are in fact utilized substantially for vacation or recreational purposes, or otherwise by individuals who do not have active roles in the planning, organization, operation of or participation in the Assembly's programs and religious activities, then a substantial nonexempt purpose would be served by Housing's activities, and Housing would not qualify for exemption under section 501(c)(3).[5]

We are satisfied, first, that petitioner has not in the period before this Court, December 17, 1982—October 31, 1984, engaged in activities to further a substantial nonexempt purpose. During this period, Housing began its preliminary work to provide the housing necessary for the Assembly. Housing's overall plans suggest the potential of additional condominium projects at the assembly grounds, but the record indicates that such development will occur in step with need.[6] Significantly, Housing has not advertised; it has responded to interested persons who appeared to meet the Assembly's qualifications for individuals who would take an active part in the Assembly's activities. The record shows that deposits from 18 apparently qualified

---

[5]Individuals whose involvement is limited to financial support of the programs and activities would not, for this purpose, be considered to have active roles. In limited circumstances, however, even purely recreational activities can further a religious purpose. As respondent himself has recognized, facilities for the rest and recuperation of missionaries on home leave further the religious purposes of the churches that sent out the missionaries. Rev. Rul. 75-434, 1975-2 C.B. 205. The record in this case does not reflect an intended use of the housing for missionaries on home leave but for those involved in the planning, organization, or operation of the Assembly's programs or for participants in those programs.

[6]Plans that would call for the commencement of construction of housing beyond the housing needs of the Assembly for people involved in the planning, organization, and operation of its programs or for participants would strongly suggest an activity that would accomplish the nonexempt purpose of providing housing for vacations or recreation.

individuals or families have been received and placed in escrow, and Housing can unilaterally terminate the purchase contract with each of these individuals. Housing has begun a modest construction project.

Second, it appears to us that petitioner has instituted reasonable controls designed to assure that individuals and families purchasing or renting the housing will be active participants in the Assembly and its operation of the religious programs at the assembly grounds. Each applicant for housing will be scrutinized by the Assembly, and though the record has little evidence of the precise scrutiny to be undertaken by the Assembly or of the particular role in the Assembly's religious activities that each prospective applicant is intended to fulfill, we believe that the sparseness of the record is due to the fledgling stage that petitioner was in during the period before us rather than to a failure of purpose.

Third, prior to resale, each housing unit must be offered for sale to the Assembly at the owner's lowest acceptable price. The Assembly may repurchase or find a purchaser suitable to the operational needs of the Assembly's activities. It appears that Housing will likely be in a financial position to aid the Assembly, if necessary, in the exercise of its right of first refusal in the proper case. Importantly, each subsequent buyer takes the property subject to the same right of refusal. If a unit is rented, the Assembly is the rental agent. These controls give petitioner the ability to assure that only active participants in the Assembly's religious activities will be permitted to acquire or use the housing.

In addition, petitioner has established that it is not operated for commercial purposes or for any private benefit. Housing, an integral part of the Assembly's operations, is a general contractor for the construction of housing on its own property to promote increased religious activity at the assembly grounds. Housing is not competing with commercial developers, builders, or operators of vacation homes or resorts. The fair market price charged for the housing does not necessarily imply that Housing is operated in a commercial manner; that charge is required in this case to avoid private inurement. Notwithstanding the explanation

on the Form 1023, Housing's net earnings are intended to be applied toward other housing needs of the Assembly or to be distributed to the Assembly. The existence of a profit does not negate the exempt purposes for which petitioner was operated. *Pulpit Resource v. Commissioner*, 70 T.C. 594, 611 (1978).

While it is possible that in actual operation petitioner may not exercise its controls as it should, we can find no reason to doubt that petitioner will diligently exercise those controls in good faith.[7] *Aid to Artisans, Inc. v. Commissioner*, 71 T.C. at 216. Since petitioner's controls will be appropriate and sufficient if exercised properly and diligently as called for by petitioner's charter and the deed from assembly to Housing, we can conclude that no substantial nonexempt purpose will be accomplished by Housing's operations. Accordingly, we hold that petitioner was organized and operated exclusively for religious purposes and is an organization described in section 501(c)(3) that is exempt from Federal income tax pursuant to section 501(a). If in actual operation, petitioner's construction program becomes more ambitious than required by the Assembly's need to develop housing for the spiritual community that plans, organizes, operates, and participates in the religious programs and activities, or if the predominant use of the housing is for vacation and recreation, a different result would then obtain.

In its application for exemption, petitioner claimed that it was not a private foundation pursuant to section 509(a)(1), 509(a)(2), or 509(a)(3). Respondent denied petitioner's request for classification as an organization that was not a private foundation pursuant to section 509(a)(1) and offered no final ruling on petitioner's request for classification under section 509(a)(2) or 509(a)(3).[8] Respondent now concedes that petitioner is described in section 509(a)(3).[9]

---

[7]Respondent concedes that petitioner intends to sell its condominiums to people actively supporting the assembly's programs and that the condominium project was undertaken to alleviate a shortage of permanent housing for individuals actively involved in such programs.

[8]Respondent's proposed adverse determination had concluded that petitioner was not an organization described in sec. 509(a)(1), 509(a)(2), or 509(a)(3).

[9]Respondent argues that we may properly decide petitioner's status only under sec. 509(a)(1), but respondent concedes petitioner's status under sec. 509(a)(3) if we find that the issue of petitioner's status under sec. 509(a)(3) is properly before the Court.

Respondent's silence on petitioner's classification under section 509(a)(3) in his final adverse determination letter cannot deprive petitioner of its right to invoke the jurisdiction of this Court to declare petitioner's private foundation status under section 509(a)(3). Sec. 7428(a)(2); *Friends of Soc. of Servants of God v. Commissioner,* 75 T.C. 209 (1980). The record fully supports respondent's concession that petitioner is described in section 509(a)(3). It would be unjust to ignore petitioner's justifiable claim. Therefore, we hold that petitioner is not a private foundation pursuant to section 509(a)(3).

Respondent's willingness now to concede petitioner's section 509(a)(3) status has not, however, eliminated the controversy between the parties in this case with respect to petitioner's status under section 509(a)(1).[10] Although respondent's concession is the equivalent of a determination that petitioner is not a private foundation, classification under section 509(a)(3) does not resolve the controversy over private foundation status when the organization requesting the determination seeks to be classified under section 509(a)(1), and the parties continue to dispute the merits of that status.

An actual controversy between the parties is essential to the exercise of our jurisdiction under section 7428. Nonetheless, it is Congress, and not the parties, who confers jurisdiction on this Court, and the existence of any dispute between them does not, of itself, assure us that we may properly resolve the controverted issue. Therefore, before deciding petitioner's section 509(a)(1) claim, we must be satisfied that we have a statutory mandate to resolve that disputed status.

As we discussed in *Friends of Soc. of Servants of God v. Commissioner, supra* at 214, section 7428 "permits organizations to seek a declaratory judgment as to their qualification under section 170(c)(2), 501(c)(3), 509(a) or 4942(j)(3) when a ruling letter request for such qualification has been denied, revoked or ignored." An organization's section 509(a) status is the subject of considerable concern both to

---

[10]Because of respondent's concession of its sec. 509(a)(3) status, petitioner has abandoned its claim that it is not a private foundation pursuant to sec. 509(a)(2). Petitioner continues to insist that it is a church and, therefore, is not a private foundation under sec. 509(a)(1).

the organization and to respondent, and deciding whether an organization is described in section 509(a)(1) or section 509(a)(3), or both, is essential to an organization's identification of what it must do, if it can do anything, to avoid private foundation status.

As stated by the Fifth Circuit in *CREATE, Inc. v. Commissioner*, 634 F.2d 803, 813 (5th Cir. 1981):

> The Tax Court opinion in *Friends of the Society of Servants of God* * * * makes clear that the receipt of a favorable ruling on a non-private status that is a different and less advantageous status than the one which is the subject of the ruling request will not defeat § 7428 jurisdiction.
>
> * * * If [the 2% limitation applicable to the foundation's contributions] results in an adverse ruling in the future on Create's status under § 509(a)(1), Tax Court jurisdiction will lie under § 7428, notwithstanding the existence at that time of a favorable ruling with respect to Create's non-private foundation status under some other, less advantageous section of the Code.

The organization in *CREATE* had sought and obtained classification as an organization described in both section 509(a)(1) and section 509(a)(3), but it disagreed with respondent's reasoning that led to its favorable classification under section 509(a)(1). The organization sought a declaratory judgment and asked this Court to resolve its dispute with respondent over respondent's reasoning for granting the classification sought by the organization.

This case stands in contrast to *CREATE*. Here the controversy is over petitioner's proper *classification* as an organization that is not a private foundation. The requirements and benefits of qualification as a section 509(a)(3) organization are significantly different from qualification as a section 509(a)(1) organization. As recognized by the Fifth Circuit, petitioner's status under each section, therefore, directly affects its classification as an organization that is not a private foundation. See also *Friends of Soc. of Servants of God v. Commissioner*, 75 T.C. 209, 220 (1980). Because the dispute between the parties concerns the *classification* of petitioner under section 509(a), petitioner's status under section 509(a)(1) is properly before this Court.

Petitioner claims to be a church within the meaning of section 170(b)(1)(A)(i). While the record demonstrates petitioner's close relationship with and service to the Assembly,

which is a church, petitioner's characteristics do not suggest its own classification as a church. In the present case, petitioner's sole activity is as the developer and general contractor for the construction of housing necessary to accomplish the Assembly's exempt purposes. We have found petitioner's exempt status under section 501(c)(3) to be necessarily dependent on the Assembly's exempt status and on its accomplishment of the Assembly's exempt purposes through the provision of housing needed by the Assembly's religious activities. Housing is not, however, a church in its own right. See sec. 1.511-2(a)(3)(ii), Income Tax Regs. See also *Lutheran Social Service v. United States*, 758 F.2d 1283 (8th Cir. 1985); *Church of the Visible Intelligence that Governs the Universe v. United States*, 4 Cl. Ct. 55 (1983).

We conclude that for the period before this Court, i.e., from its formation until October 31, 1984, petitioner is an exempt organization described in section 501(c)(3) exempt from income tax pursuant to section 501(a) and that petitioner is not a private foundation pursuant to section 509(a)(3).

*An appropriate decision will be entered.*